## CORRALITOS COMPANY *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 267. Submitted April 24, 1900. — Decided May 28, 1900.

The appellant herein filed its original petition in the Court of Claims against the United States and the Apache Indians on September 6, 1892. Subsequently and by leave of court an amended petition was filed March 2, 1894, from which it appears that the petitioner is a corporation chartered under the laws of the State of New York and doing business in the state of Chihuahua, county of Guleana, Republic of Mexico, and that property to the value of nearly seventy-five thousand dollars, belonging to the petitioner, and situated at the time in the Republic of Mexico, was taken therefrom in 1881 and 1882, and stolen and carried off by the Apache Indians, then in amity with the United States, and brought from the Republic of Mexico into the United States. By virtue of the act of Congress entitled "An act to provide for the adjudication and payment of claims arising from Indian depredations," approved March 3, 1891, judgment for the value of the property thus taken by the Indians was demanded. The United States filed a plea in bar, alleging that the claimant ought not to have and maintain its suit, " because the depredation complained of is alleged to have occurred in the Republic of Mexico, beyond the jurisdiction of the United States and the courts thereof, and that the court, therefore, had no jurisdiction to entertain this suit." The plaintiff demurred to the plea in bar as bad in substance. The Court of Claims overruled the demurrer, sustained the plea in bar, and dismissed the petition. *Held* that the judgment of the Court of Claims was right, and it must be affirmed.

THE appellant herein filed its original petition in the Court of Claims against the United States and the Apache Indians on September 6, 1892. Subsequently and by leave of court an amended petition was filed March 2, 1894, from which it ap-

pears that the petitioner is a corporation chartered under the laws of the State of New York and doing business in the state of Chihuahua, county of Guleana, Republic of Mexico, and that property to the value of nearly seventy-five thousand dollars, belonging to the petitioner, and situated at the time in the Republic of Mexico, was taken therefrom in 1881 and 1882, and stolen and carried off by the Apache Indians, then in amity with the United States, and brought from the Republic of Mexico into the United States. By virtue of the act of Congress entitled "An act to provide for the adjudication and payment of claims arising from Indian depredations," approved March 3, 1891, c. 538, 26 Stat. 851, judgment for the value of the property thus taken by the Indians was demanded.

The United States filed a plea in bar, alleging that the claimant ought not to have and maintain its suit, "because the depredation complained of is alleged to have occurred in the Republic of Mexico, beyond the jurisdiction of the United States and the courts thereof, and that the court, therefore, had no jurisdiction to entertain this suit."

The plaintiff demurred to the plea in bar as bad in substance.

The Court of Claims overruled the demurrer, sustained the plea in bar, and dismissed the petition. 33 C. Cl. 342. The petitioner appealed from that judgment to this court.

*Mr. John Critcher* for appellant.

*Mr. Assistant Attorney General Thompson* and *Mr. Lincoln B. Smith* for appellees.

MR. JUSTICE PECKHAM, after stating the foregoing facts, delivered the opinion of the court.

The very satisfactory opinion of the Court of Claims in this case leaves little to be said by us in affirming the judgment of that court.

It would require very plain language from Congress by which to impose a liability on the part of the United States for the seizure or stealing by Indians of property belonging to a citizen

of the United States, but situated at the time of such seizure or stealing within the confines and jurisdiction of a foreign sovereignty. Generally the government admits no liability for the destruction of the property of its citizens by third parties, even when it occurs within the limits of the United States. Still less reason would exist for the acknowledgment of any such liability for property of its citizens destroyed or stolen within the limits and under the jurisdiction of a foreign nation.

Upon proof of the existence of certain facts the United States, however, at an early day admitted an exceptional liability in favor of its citizens whose property within the United States had been destroyed by friendly Indians. By chapter 30 of the act of May 19, 1796, 1 Stat. 469, provision was made for a boundary line to be established between the United States and various Indian tribes, which was to be clearly ascertained and distinctly marked; and by section 14 of that act it was provided: "That if any Indian or Indians belonging to any tribe in amity with the United States shall come over or across the said boundary line, into any State or Territory inhabited by citizens of the United States, and there take, steal or destroy any horse, horses or other property, belonging to any citizen or inhabitant of the United States, or of either of the territorial districts of the United States," then, in such case, it was made the duty of such citizen to make application to the superintendent, or such other person as the President of the United States should authorize for that purpose, who, being furnished with the necessary documents and proofs, and under the direction of the President, was to make application to the nation or tribe to which the Indian or Indians belonged for satisfaction, and provision was made for obtaining the same, if possible.

The section contained a provision that "In the meantime, in respect to the property so taken, stolen or destroyed, the United States guarantee to the party injured an eventual indemnification."

No particular method was provided for obtaining such indemnification, and it rested with Congress when and how to make it.

The property mentioned in this section, it will be seen, is

property in any State or Territory of the United States, and it must have been stolen or destroyed by Indians belonging to a tribe in amity with the United States, who had come over, or across, the boundary line mentioned in the first section of the statute. The language of the statute is plainly confined to the destruction or stealing of property situated at the time within a State or Territory of the United States. The statute acknowledges and provides for no responsibility or liability for property of citizens of the United States situated within the domain of a foreign State at the time of its seizure or destruction.

By the act approved March 30, 1802, c. 13, 2 Stat. 139, a boundary line was again established between the United States and various Indian tribes, and the fourteenth section of that act again provided for an eventual indemnification by the United States for property lost under the same conditions as were stated in the act of 1796, and no liability was acknowledged, or provided, for any loss or destruction of property outside and beyond the jurisdiction of the United States.

Although there was, subsequent to the act of 1802, frequent legislation by Congress upon the subject of trading with the Indians, yet the liability of the government for property stolen or destroyed remained the same.

No change in regard to such liability was made by the act approved June 30, 1834, c. 161, 4 Stat. 729. Section 17 of that statute provided that: "If any Indian or Indians, belonging to any tribe in amity with the United States, shall, within the Indian country, take or destroy the property of any person lawfully within such country, or shall pass from the Indian country into any State or Territory inhabited by citizens of the United States, and there take, steal or destroy" certain property, substantially the same proceedings as in the former statutes should be taken against the tribe to which the Indians belonged, for recovering the value of the property so taken, and the United States guaranteed eventual indemnification to the citizen whose property was taken, the same as in the former statutes. The "Indian country" mentioned in the act included the country contained within the boundary lines mentioned in

the preceding acts, above referred to. The liability of the government for property was still limited, by the act of 1834, to that taken or destroyed in the Indian country, or in a State or Territory of the United States.

By section 8 of the act approved February 28, 1859, making appropriations for the expenses of the Indian department, so much of the act of 1834 as provided that the United States should make indemnification out of the Treasury for property taken or destroyed in certain cases by Indians trespassing on white men, was repealed, thus taking away the obligation of the government to eventually indemnify the citizen for property taken by the Indians, as provided in the former statutes.

By a general resolution, approved June 25, 1860, 12 Stat. 120, the repeal of the indemnity provision by the act of 1859 above mentioned was directed to be so construed as not "to destroy or impair any indemnity which existed at the date of said repeal." Citizens whose property had been taken or destroyed under the circumstances provided for in the statute of 1834 had generally been paid by deducting the value of the property destroyed from annuities due the respective tribes, without any specific appropriation having been made therefor, though there were some acts passed prior to 1859 for the payment of such claims out of the Treasury of the United States.

These various acts are referred to and a history of the legislation upon the subject of claims for Indian depredations is given in the opinion delivered in the Court of Claims in the case of *Leighton* v. *United States*, 29 C. Cl. 288.

It is evident from the legislation enacted that claims for Indian depredations had prior to 1872 become quite frequent. By section 7 of the Indian appropriation act, approved May 29, 1872, 17 Stat. 165, 190, it was provided that the Secretary of the Interior should prepare and cause to be published such rules and regulations as he deemed necessary to prescribe the manner of presenting claims "arising under existing laws or treaty stipulations, for compensation for depredations committed by the Indians, and the degree and character of the evidence necessary to support such claims." By existing laws or treaty stipulations there was no pretense of any obligation of the govern-

ment to guarantee the eventual payment for property destroyed or stolen beyond the limits of the United States. It was further provided in the act of 1872 that the Secretary should carefully investigate such claims as might be presented, subject to the rules and regulations prepared by him, and report to Congress at each session the nature, character and amount of such claims, whether allowed by him or not, and the evidence upon which his action was based, and it was provided that no payment on account of any claim should be made without a specific appropriation therefor by Congress.

It will be seen that the claims which the Secretary of the Interior was authorized to investigate were claims "arising under existing laws or treaty stipulations." That act did not enlarge the character of the responsibility of the government beyond what it was prior to its passage.

By the Indian appropriation act, approved March 3, 1885, 23 Stat. 362, 376, an appropriation was made for the investigation of certain Indian depredation claims, which, it is obvious, were claims of the description included in the former statutes upon the subject, and the appropriation was plainly not meant to provide for the investigation of claims for property destroyed outside the limits of the United States.

Pursuant to the provisions in these appropriation acts, it seems that the Secretary of the Interior had caused to be examined and allowed numerous claims for the loss or destruction of property by Indians, and had reported the same to Congress, but Congress had made no appropriation to pay them. In addition to the claims thus approved by the Secretary of the Interior and reported to Congress, it is said that a still greater number were pending in the department for investigation, and in this state of affairs Congress passed the act of 1891, 26 Stat. 851, providing as follows:

"That in addition to the jurisdiction which now is, or may hereafter be, conferred upon the Court of Claims, said court shall have and possess jurisdiction and authority to inquire into and finally adjudicate, in the manner provided in this act, all claims of the following classes, namely:

"First. All claims for property of citizens of the United States

taken or destroyed by Indians belonging to any band, tribe or nation in amity with the United States, without just cause or provocation on the part of the owner or agent in charge, and not returned or paid for.

" Second. Such jurisdiction shall also extend to all cases which have .been ·examined and allowed by the Interior Department, and also to such cases as were authorized to be examined under the act of Congress making appropriations for the current and contingent expenses of the Indian Department, and for fulfilling treaty stipulations with various Indian tribes for the year ending June 30, 1886, and.for other purposes, approved March 3, 1885, and under subsequent acts, subject, however, to the limitations hereinafter provided."

Here, for the first time, jurisdiction is conferred upon a court to inquire into and finally adjudicate in regard to the validity of claims against the government arising out of Indian depredations, as described in this act. Up to the time of its passage, and since the passage of the act of 1872, claimants had been compelled to rely for compensation for losses so incurred upon a special application to Congress, made in each case to that body directly or through the Secretary of the Interior.

The purpose of Congress in enacting the statute of 1891 undoubtedly was to provide thenceforth a judicial tribunal for the hearing of such claims and for their payment in accordance with the judgment of the court. It is true that the language of the provision in the act of 1891, which confers jurisdiction upon the Court of Claims, differs somewhat from that used in the various prior statutes, which had guaranteed the eventual indemnification of the claimant by the government, but such difference is not in our judgment at all significant of an intention to enlarge the liability of the government to a greater extent than had ever before been recognized.

Considering the prior legislation of Congress in regard to claims for Indian depredations, none of which recognized any liability of the nature of the claim now made, is it reasonably possible for us to say that Congress intended by the act of 1891 to increase the liability of the government, and to extend it to property destroyed within the limits and jurisdiction of a foreign

state, when it has failed to use any language to plainly signify so extraordinary a departure from its past policy? Up to 1891 there is not the slightest ground for asserting that any such obligation had ever been acknowledged on the part of Congress in any legislation enacted by that body. Up to that time it had always confined the liability of the government, in any event, to a claim for the stealing or destruction of property within the limits of the United States, and we think that if any such radical and material departure from the policy of the government from its foundation had been intended by the act of 1891, plain language to accomplish such a change would have been found in that act. We look in vain for any such language.

Instead of enlarging its liability beyond that which it provided for in the earlier statutes, we find that in 1859 Congress repealed the law by which the government became a guarantor for eventual indemnification to the owner for property destroyed by Indians. The act of 1891 again altered that liability, and provided for the rendition of judgment against the government for the value of the property taken or destroyed, and also against the tribe of Indians committing the wrong, if it were possible to identify such tribe, and the judgment in that case was to be deducted from the annuities due the tribe from the United States, as provided in the sixth section, and if payment could not be procured from the tribe, then the amount of the judgment was to be paid from the Treasury of the United States, which payment was to remain a charge against the tribe, and was to be deducted from any annuity fund or appropriation which might thereafter become due from the United States to such tribe.

By this act of 1891, the obligation of the United States as a substantial guarantor is again acknowledged, notwithstanding the act of 1859; but it is acknowledged in the plain language contained in the sixth section, which provides a means of payment of the judgment obtained pursuant to the provisions of the act. Correspondingly plain language would have been used in this act had it been intended to enlarge the general scope of the liability of the government so as to include Indian depredations committed within the borders of a foreign State.

A decision of the question of what would be the nature of an action like this, if between private individuals, whether transitory or not, would give us no aid in determining the meaning of this act of Congress. The jurisdiction of the court depends wholly upon the act, and we must construe its meaning from the language used in connection with the previous legislation on the subject. In so construing the act we have no doubt that it does not include claims for property destroyed or stolen within the limits of a foreign country.

It was said by the Court of Claims, in the opinion delivered in this case, as follows:

"The United States (unless for some express agreement between the two nations) may not discipline or control Indian tribes within the Mexican territory, and, being without power to enter that territory in time of peace without Mexico's consent, is without direct responsibility for what may there occur. Wrongs sustained by a citizen of the United States while in Mexico can only be remedied through the executive branch of the government, and do not present causes of action in the courts. If citizens of the United States resort to Mexico, they may expect, and their government may demand for them, equality of safety and protection with the citizens of that country, an unbiased administration of the laws in relation to them and their property, and any special advantages (if such there happen to be) expressly reserved by treaty. Beyond this there is no right.

"It is not alleged that this plaintiff was subjected to any loss other than that which occurred at the hands of Indians within the territorial jurisdiction of Mexico; to remedy that loss he must resort to the Mexican courts, if the law of that republic happen to provide a remedy through its judiciary for such misfortunes. Failing that, an appeal might possibly be made upon the Mexican government through the executive department of the government of the United States, if the facts so authorize and that department deem such an appeal advisable and wise. In any event, the matter in dispute does not fall within the jurisdiction of this court."

For these reasons, among others, the court came to the conclusion that Congress did not intend by the act of 1891 to en-

large the liability of the government so as to include property destroyed or stolen in foreign territory.

We agree with the results arrived at by the Court of Claims, and think it unnecessary to add to what has been so well said by that court.

The judgment is right, and must be

*Affirmed.*