[No. 1690, May 24, 1915.]

## FIRST NATIONAL BANK OF RATON et al. v. McBRIDE, County Treasurer.

### SYLLABUS BY THE COURT.

1. National banks are not protected against discriminatory taxation in favor of other "moneyed capital" by section 5219, R. S. U. S., 5 Fed. Ann. 157 (U. S. Comp. St. 1913, § 9784) unless such other "moneyed capital" is employed in a business which is competitive with that of national banks.

P. 386

2. Relief in equity by injunction against discriminatory taxation may be obtained, in a proper case, notwithstanding the discrimination is accomplished, not by overvaluation of the property of the complaining taxpayer, but by the undervaluation of the property of other taxpayers, and where the discrimination is willful and intentional.

P. 391

3. Before resort to a court of equity can be had for relief against discriminatory taxation, even in cases where the same is willful and intentional, the complaining taxpayer must have either no adequate legal or statutory remedy, or he must have first exhausted the same without avail.

P. 398

Appeal from District Court, Colfax county; T. D. Lieb, Judge.

Action by the First National Bank of Raton, and others, against Thomas McBride, Treasurer of Colfax County, N. M. From judgment for plaintiffs, defendant appeals. Reversed and remanded.

IRA L. GRIMSHAW, Assistant Attorney General, for the State.

The court erred in holding that complainants alleged a violation of section 5219 of the Revised Statutes of the

United States, because that section does not apply to moneyed capital in the hands of individuals unless such money comes into competition with the money of national banks.

Mercantile Bank v. New York, 121 U. S. 138; Evansville Bank v. Brittan, 105 U. S. 322; Talbott v. Silver Bow County, 139 U. S. 438; First National Bank of Garnett v. Ayers, 160 U. S. 660; Aberdine Bank v. Chahalis, 166 U. S. 440; Merchants' Bank v. Penn., 167 U. S. 461; National Bank of Wellington v. Chapman, 173 U. S. 205; Jenkins v. Neff, 186 U. S. 230; Illinois National Bank v. Kensella, 201 Ill. 31; Richards v. Town of Grand Rapids, 31 Fed. 505; National Bank of Baltimore v. Mayor, 92 Fed. 239; National Bank v. Baltimore, 100 Fed. 24; Ankney v. Blakley, 44 Oreg. 79; First National Bank v. Turner, 154 Ind. 455; Board of County Commissioners of Silver Bow County v. Davis, 6 Mont. 306, 307, et seq.; Matter of Appeal of McMahon, 102 N. Y. 176, 187-190; Bank of Redemption v. Boston, 125 U. S. 60, 66, et seq.; Mercantile National Bank v. Hubbard, 98 Fed. 465, 471; Peoples' National Bank v. Marye, 107 Fed. 570, 579-580; Jenkins v. Neff, 163 N. Y. 320, 326, et seq.; National Bank v. King County, 9 Wash. 607, 610, et seq.; Mechanics National Bank v. Baker, 65 N. J. L. 113, 118.

E. C. CRAMPTON and O. L. PHILLIPS, both of Raton, and CHAS. A. SPIESS of Las Vegas, for appellees.

The assessment of appellee's property was effected by a well-defined scheme of discrimination. It is therefore void.

South Springs R. & C. Co. v. Board, 139 Pac. (N. M.) 159.

The law giving notice of the meeting of the state board is not notice to those who are wronged by the imposition of an illegal tax.

South Springs R. & C. Co., supra.

Purposeful discrimination creating inequality is the basis for equitable interference.

Taylor v. Louisville & N. R. Co., 88 Fed. 350; Wells Fargo & Co. v. Johnson, 214 Fed. 180; Louisville & N. R. Co. v. Bosworth, 209 Fed. 380; Citizens' Nat. Bank v. Board, 111 Pac. (Kan.) 496; Cummings v. Bank, 101 U. S. 153; A. T. & S. F. R. Co. v. Sullivan, 173 Fed. 456.

As to what is "moneyed capital," see Mercantile Nat. Bank v. Hubbard, 98 Fed. 465; Boyer v. Boyer, 113 U. S. 689.

### OPINION OF THE COURT.

PARKER, J.—This is a suit in equity to restrain a tax sale. Three national banks and one state bank join as plaintiffs. The plaintiffs allege that, in pursuance of a notice by the county assessor that all property must be returned at 35 per cent. of its actual value, they returned their property at 35 per cent. of its actual value, while many other taxpayers of the county returned their property at a much less rate. They allege that the said notice and requirement of the assessor was "intentionally, systematically, and arbitrarily" made and promulgated for the purpose of causing plaintiffs to pay a larger tax than other taxpayers, and that said scheme was effectuated by means of various acts of the assessor, which may be summarized as follows: That he intentionally and willfully failed to assess or to require to be returned credits, mortgages, and other moneyed capital in the hands of individuals to an amount of over $100,000; that he assessed the real estate of plaintiff at 50 per cent. of its value, while the real estate of other taxpayers was assessed at a rate not exceeding 35 per cent.; that he directed owners of live stock to return only two-thirds of the number of animals, and assessed the same at 35 per cent. of their value; that he added to the returns of plaintiffs their undivided profits, and assessed the same at 35 per cent. of the amounts. They further alleged that thereafter the board of county commissioners, sitting as a board of equaliza-

tion, reduced the assessment of plaintiffs in certain named amounts for the purpose of equalizing the taxes of tax-payers. They allege that thereafter an appeal on behalf of certain taxpayers was perfected and presented to the state board of equalization, requesting that the valuation of the property of the First National Bank of Raton and the National Bank of New Mexico, of Raton, plaintiffs herein, be restored to that fixed by the assessor, which appeal was sustained, and said valuations restored; that thereafter the state board of equalization made a general order which is as follows:

"Inspection of the tax rolls disclose the fact that there is great variation and lack of uniformity in the assessment of banks in the different counties in the state, such assessments having been made in some cases lower and in others higher than the valuation fixed by this board at its meeting in February last, and it therefore becomes the duty of the board to equalize the assessment of banks in the different counties. It is therefore ordered that all banks in the state shall be assessed at the uniform rate of fifty (50) per cent. of their capital stock, surplus, and undivided profits, as directed by the board at its February meeting, and this is to be construed as including the whole of the capital stock, surplus, and undivided profits, as they existed on the 1st day of March, 1912; and the treasurers of the respective counties are directed to change the assessments of all banks, by raising or lowering the same, so as to conform with this order."

They allege that thereafter the assessor extended the valuations of plaintiffs' property upon the tax rolls as fixed by the state board of equalization, and did so "arbitrarily, willfully, and intentionally, for the purpose of compelling plaintiffs to pay a larger tax in proportion to the value of their property" than other taxpayers in the county; that he failed and refused to raise the valuation of other taxpayers in like proportion, and again failed and refused to assess credits, mortgages, or other monied capi-

tal in the hands of individuals to the amount of at least $100,000, and failed and refused to add the one-third in number of the live stock theretofore omitted from the tax rolls.    They allege that thereafter the board of county commissioners approved the action of the assessor, and approved the tax rolls as so prepared, and the same were delivered to the defendant, as treasurer and ex officio collector, for the collection of the taxes.    They allege that they have paid the amount of taxes due, according to the valuations as fixed by the board of county commissioners, but that the defendant, notwithstanding, has advertised a tax sale, and is about to sell plaintiffs' property for the balance of taxes unpaid, to the irreparable injury of plaintiffs, unless restrained by order of the court.    Aside from the alleged illegality of the taxes, plaintiffs allege, as a basis for equitable interference, that said sale, unless restrained, will create a cloud upon the title of plaintiffs; that said sale will result in irreparable injury to the three national banks, plaintiffs, but in what manner is not pointed out; and that plaintiffs will be compelled to bring a multiplicity of suits in order to recover the money paid. owing to its distribution to the various funds to which it would belong, and which funds are under the control of various public officers.    They pray for an injunction to restrain the sale.

The substance of the complaist may be summarized as follows:    The national banks, plaintiffs, are illegally taxed because "credits, mortgages, or other moneyed capital in the hands of individuals" are not taxed; all of plaintiffs are illegally taxed because they are taxed at a higher valuation than other taxpayers similarly situated; and that said condition is the result of arbitrary, willful, and intentional acts of the taxing officers done for the purpose.

A demurrer to the complaint was interposed and overruled by the court, and, the defendant electing to stand upon his demurrer, a permanent injunction was awarded as prayed.    The demurrer went upon the ground that the complaint failed to state facts sufficient to constitute a cause of action, and specified many particulars in this re-

gard. It is deemed sufficient in form to raise all but one of the questions which will be discussed.

[1] The three national banks, plaintiffs, make a contention applicable to them only, and it is that, being banking corporations, organized and existing under the federal banking laws, they are protected against discriminatory taxation by the terms of section 5219, R. S. U. S. 5 Fed Stat. Ann. 157, which prohibits taxation of national banks "at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state." This section of the federal statute has been carefully interpreted by the federal courts, and some state courts, and has come to have a clear and definite meaning. An examination of these cases will clearly demonstrate that the words "moneyed capital" do not include all moneyed capital in the hands of individuals, but include only such moneyed capital as is employed in a business which is a competitive business with that of national banks. Thus, in First National Bank v. Chahalis County, 166 U. S. 440, 17 Sup. Ct. 629, 41 L. Ed. 1069, the same state of facts practically as the facts made out by the complaint in this case was before the Supreme Court of the United States. In that case the same complaint was made that capital in the form of money, invested in loans and securities, existed in the state of Washington, in the sum of $14,000,000; that the same was purposely omitted from the assessment and from taxation whatsoever by all of the taxing officers throughout the state of Washington; that the omission by the taxing officers to tax said moneyed capital was in pursuance of an agreement between them, and was in pursuance of an opinion rendered by the Attorney General of that state; that such omission necessarily operated as a discrimination in favor of other moneyed capital in the hands of individual citizens against shares of stock of national banking corporations in the state; and that such discrimination was well known to, and most wrongfully intended by, the state taxing officers. The case was before the Supreme Court of the United States on demurrer to the complaint. The court,

after reviewing most of the previous decisions of that court, said:

> "The conclusions to be deduced from these decisions are that money invested in corporations or in, individual enterprises that carry on the business of railroads, of manufacturing enterprises, mining investments, and investments in mortgages does not come into competition with the business of national banks, and is not therefore within the meaning of the act of Congress; that such stock as those in insurance companies may be legitimately taxed on income, instead of on value, because such companies are not competitors for business with national banks; and that exemptions, however large, of deposits in savings banks, or of moneys belonging to charitable institutions, if exempted for reasons of public policy, and not as an unfriendly discrimination against investments in national bank shares, should not be regarded as forbidden by U. S. Rev. Stat. § 5219. * * * As to the sum of $237,400 alleged to be invested by individual citizens of Chehalis county in loans and securities to them payable and owing by other citizens of that county, we are not informed by the bill of the nature of such loans and securities, and, as against the pleader, we may well assume that they belong to a class of investments which does not compete with the business of national banks. The same is true of the sum of $14,000,-000 alleged to be invested in loans and securities by citizens of the state of Washington and to them payable and owing by other citizens of said state."

In Mercantile Bank v. New York, 121 U. S. 138, 7 Sup. Ct. 826, 30 L. Ed. 895, the question arose as to a definition of "moneyed capital," within the meaning of section 5219, R. S. U. S. The suit was for an injunction by a national bank against the collection of a tax upon its shareholders based upon the proposition that other

moneyed capital in the hands of individual citizens was invested in industrial stocks. In that case the Supreme Court said:

"The main purpose, therefore, of Congress, in fixing limits to state taxation on investments in the shares of national banks, was to render it impossible for the state, in levying such a tax, to create and foster an unequal and unfriendly competition, by favoring institutions or individuals carrying on a similar business and operations and investments of a like character. The language of the act of Congress is to be read in the light of this policy. * * * But 'moneyed capital' does not mean all capital the value of which is measured in terms of money. In this sense all kinds of real and personal property would be embraced by it, for they all have an estimated value as the subjects of sale. Neither does it necessarily include all forms of investment in which the interest of the owner is expressed in money. * * * The business of banking, as defined by law and custom, consists in the issue of notes payable on demand, intended to circulate as money where the banks are banks of issue; in receiving deposits payable on demand; in discounting commercial paper; making loans of money on collateral security; buying and selling bills of exchange; negotiating loans; and dealing in negotiable securities issued by the government, state and national, and municipal and other corporations. These are the operations in which the capital invested in national banks is employed, and it is the nature of that employment which constituted it, in the eye of this statute, 'moneyed capital.' Corporations and individuals carrying on these operations do come into competition with the business of national banks, and capital in the hands of individuals thus employed is what is intended to be described by the act of Congress."

In National Bank v. Baltimore, 100 Fed. 24, 40 C. C. A. 254, the Circuit Court of Appeals of the Fourth Circuit, after citing Mercantile Bank v. New York and First National Bank v. Chahalis County, supra, said:

"It is the nature of the employment that fixes its character. Wherever money is employed in the carrying on of a business, the object of which is the making of profit by its use as money, it is moneyed capital. When such capital is invested in loans or securities of a permanent or temporary character, if it is so invested with a view to sale and reinvestment for the purpose of making money by the operation, it is moneyed capital. The securities themselves do not necessarily come within the definition. * * * The true test is the nature of the business in which the person is engaged, and that cannot be determined by the character of the investment."

In First National Bank v. Chapman, 173 U. S. 205, 19 Sup. Ct. 407, 43 L. Ed. 666, the claim was made by a national bank that its rights under section 5219, R. S. U. S., had been invaded by reason of the fact that the owners of what is termed credits in the law of Ohio were permitted to deduct certain kinds of their debts from the total amount of their credits, and were assessed on the balance only, while no such right is given to owners of shares in national banks. The court, in defining "moneyed capital," said:

"The result seems to be that the term 'moneyed capital,' as used in the federal statute, does not include capital which does not come into competition with the business of national banks, and that exemptions from taxation, however large, such as deposits in savings banks or moneys belonging to charitable institutions, which are exempted for reasons of public policy, and not as an unfriendly discrimination as against investments in national bank shares, cannot be regarded as forbidden by the federal statute."

See citations to section 5219, R. S. U. S., appended to the section in 5 Fed. Stat. Ann. 157.

Counsel for plaintiffs cite and rely upon Evansville National Bank v. Britton, 105 U. S. 322, 26 L. Ed. 1054, and Boyer v. Boyer, 113 U. S. 689, 5 Sup. Ct. 706, 28 L. Ed. 1089. Both of these cases involve the question of exemption from taxation to taxpayers. In each case the exemption extended to other taxpayers, was withheld from owners of national bank shares. In the former case "credits or money at interest" was held to be "moneyed capital," within the meaning of section 5219, Rev. Stat. U. S. In the latter case "all mortgages, judgments, and recognizances whatsoever, and all moneys due or owing upon articles of agreement for the sale of real estate," were held to be "moneyed capital," within the meaning of said section. In both cases, because the same exemptions were not extended to owners of shares in national banks, the court held the plaintiffs entitled to relief. It is difficult for us to reconcile these two decisions with the later decision of the Supreme Court of the United States. If property of the character involved in those two cases is "moneyed capital," within the meaning of the federal statute, when the question is as to exemptions, then it is difficult to understand why it should not be "moneyed capital" under all circumstances when the question of discriminations against shareholders of national banks arises. We believe, however, that the present position of the Supreme Court, which is certainly a departure from the holding in the two last-mentioned cases, has been reached by a gradual process of elimination and definition of the words "moneyed capital" until they have now come to mean moneyed capital engaged in a competitive business with national banks. In the complaint in this case no allegation is contained which either by direct averment or by inference would authorize us to hold that the "moneyed capital" therein mentioned was in any degree employed in competition with the business of national banks. We therefore hold that the allegation states no cause of action, and the demurrer thereto should have been sustained.

[**2**]   The second proposition is that all of the plaintiffs are taxed at a higher valuation than other taxpayers similarly situated, and that such condition is the result of arbitrary, willful, and intentional acts of the taxing officers.

At the time this tax was laid the law required that all property be taxed at its full cash value.  There is no allegation by plaintiffs that they were assessed more than or as much as full value, but they allege an assessment against them of 50 per. cent. of full value.  They claim that they have been arbitrarily, willfully, and intentionally discriminated against, and that such discrimination has been accomplished by omitting from the tax rolls other moneyed capital and one-third of all live stock, and by assessing such property as has been assessed at a lower rate of valuation than that of plaintiffs.  They complain not of overassessment, but of failure to tax others equally with them, as a result of an intentional wrong on the part of the taxing officer.  This is what is termed by Judge Cooley as "invidious assessment."  1 Cooley on Taxation (3d Ed.) 385.  Such taxation, of course, violates the letter and spirit of our Constitution, which provided, at the time this tax was laid, that:

> "The rate of taxation shall be equal and uniform upon all subjects of taxation."   Section 1 of article 8 of the state Constitution.

Section 9 of article 8 provides also that:

> "All property within the territorial limits of the authority levying the tax, and subject to taxation, shall be taxed therein for state, county, municipal and other purposes."

None of the property in question is subject to any exemptions, so far as appears.

The proposition involved is one of much difficulty. When a taxpayer is required to return his property at its full cash value for taxation purposes, and where he has returned it or has been taxed upon it only 50 cents on the dollar, it is difficult to understand how he can appeal to a court of equity for relief simply because some other taxpayers have been more fortunate and have escaped in a

greater degree the just taxation to which their property was subject. To ask a court of equity for relief, under such circumstances, is to ask the court, from one point of view, to become a party to a patent violation of the law. It is asking the court to assist the taxpayer to violate the law because the law has been violated, either by another class of taxpayers or by the taxing officers in the latter's behalf. Every court must naturally shrink from taking any such position. But there inheres in the nature of the subject of taxation a necessity oftentimes which would seem to authorize, if not require, equitable interference. A taxpayer who has been unjustly discriminated against may ordinarily obtain relief by applying first to the assessor, next to the county board of equalization, and finally to the state board of equalization for the redress of his grievances. His grievances may be redressed either by a reduction of the valuation of his property to an equality with that of the other taxpayers, or by the raising of the valuations of the other taxpayers to a proportion equal to that of his property, and by the placing of omitted property on the tax roll. This result can be accomplished by application to the assessing officers. If they fail or refuse to remedy the defect, the taxpayer may appeal to the county board of equalization, who have at least power to reduce his valuations to an amount equal to that of other taxpayers similarly situated. If the county board refuses to remedy the defect, he may appeal to the state board of equalization for relief. But suppose that all of these assessing and taxing officers fail to award to the taxpayer the relief to which he is entitled; in such case there arises an overpowering necessity for the intervention of the restraining power of the courts. The courts have no power to list property for taxation which has been omitted, and they have no power to raise the valuations of classes of property to the same proportionate value as that of other classes of property. All that the courts can do is to reduce the valuations of the property of the complaining taxpayer who has been intentionally discriminated against to an equality with that of other taxpayers, and thus give effect to the constitutional provision as to equality and

uniformity in taxation.   This proposition has often been before both the federal and the state courts.

In Taylor v. Louisville & N. R. Co., 88 Fed. 350, 31 C. C. A. 537, the state taxing officers had assessed railroad property in the state of Tennessee at its real value, whereas all other property of the state was habitually and intentionally assessed by the assessing officers at not exceeding 75 per cent. of its real or correct value.   The Tennessee Constitution required equality and 'uniformity in taxation.   The court, speaking through Taft, Circuit Judge, said:

"The sole and manifest purpose of the Constitution was to secure uniformity and equality of burden upon all the property in the state.   As a means of doing so (conceding that defendant's construction is the correct one), it provided that the assessment should be according to its true value.   *   *   *   We have before us a case in which the complaining taxpayer, and other taxpayers owning the same species of property, are taxed at a higher rate than the owners of other species of property.   This does not come about by legislative discrimination, but by the intentional and systematic disregard of the law by those charged with the duty of assessing all other species of property than that owned by complainant and its fellows of the same class.   This is a flagrant violation of the clause of the Constitution forbidding discrimination in taxation between different species of property.   That clause is self-executing.   Reelfoot v. Dawson, 97 Tenn. 160, 36 S. W. 1043 [34 L. R. A. 725].   *   *   * The question presented is, then, whether, when the sole object of the article of the Constitution is being flagrantly defeated, to the gross pecuniary injury of a class of litigants, and one of them appeals to a court of equity for relief, it must be withheld because the only mode of granting it will involve an apparent departure from the method marked out by the Constitution and

the law for attaining its sole object. We say 'apparent' departure from the constitutional method, because that instrument contemplated a system in which all property should be assessed at its real value. It did not intend that a large part should be assessed at 75 per cent., and a smaller part at 100 per cent. The method of assessing one species of property cannot be truly said to be constitutional without having regard to that pursued with other species; for the essence of the constitutional requirement is uniformity, and uniformity cannot be affirmed to exist without a due regard to the methods of assessing all species. Therefore, to enjoin the enforcement of the prescribed methods of assessment as to one species of property, when there is a departure from it as to all others, if the injunction secures uniformity as to all, is not so great a violation of the method really prescribed as that involved in a continuance of the existing conditions and the denial of relief to the injured taxpayer. The court is placed in a dilemma from which it can only escape by taking that path which, while it involves a nominal departure from the letter of the law, does injury to no one, and secures that uniformity of tax burden which was the sole end of the Constitution."

The court cites several cases from the state courts, among them Randell v. City of Bridgeport, 63 Conn, 321, 28 Atl. 523, in which the court found that the plaintiff's property was assessed at its full market value as the statute required, while the uniform rule of the board of assessors was to value all other property for the purpose of taxation at one-half of its fair market value. The Connecticut court held that the complainant was entitled to an assessment of one-half the real value of his property, and this in the face of the mandatory provision of the statute that all property should be assessed at its true value. Judge Taft says in regard to this case:

First National Bank of Raton v. McBride, 20 N. M. 381.

> "The point of this case, and those about to be cited, is that, where either the uniformity required by law or the prescribed means of attaining it must be departed from, the court will choose the lesser evil."

In Cocheco Co. v. Strafford, 51 N. H. 455, the law provided that all taxable property should be appraised at its full and true value in money. The court said:

> "Justice requires an equal rate of taxation of Strafford real estate. If the Strafford real estate of others was appraised in 1870 at a less rate than its full value, the real estate of the plaintiff should be appraised by the commissioners at the same rate, so that the plaintiffs shall pay their proportion of tax, and no more."

In Ex parte Ft. Smith & Van Buren Bridge Co., 62 Ark. 461, 36 S. W. 1060, the case arose on an appeal from the refusal of the county board of equalization to reduce the taxation or assessment upon the petitioner's bridge. The assessor had assessed one-half of the bridge in Crawford county at $150,000, and the county board had reduced the assessment to $125,000. It appeared that the bridge was worth $250,000, and that $125,000, therefore, was the full value of one-half of the bridge. It appeared that all the real estate in Crawford county was assessed at 50 per cent. of its actual value. The bridge company contended that, under the circumstances, the assessment of one-half the bridge should be reduced, according to its request, to $75,000. The Arkansas court said:

> "It may be said that, inasmuch as its property was not assessed above its true value, it had no right to complain. But this is not true. It had the right to demand that no unequal burden be imposed upon it by taxation. * * * The duty to contribute to the support of the state government by the payment of taxes is imposed upon all persons owning property subject to taxation. The Constitution provides that this burden shall be apportioned among them according to the value of their property, to be ascertained

as directed by law. When, therefore, the property of a few is taxed according to its value, and of all others at one-half its value, then the few are required to contribute double their portion of the burden. This is manifestly a wrong, and justice demands that it be redressed whenever it can be done conformably to the laws." ·

In Board of Supervisors v. C., B. & Q. R. Co., 44 Ill. 229, the appeal was a direct appeal from the board of supervisors. It appeared that the valuation of property of individuals, except that of the railroad company, ranged from one-fifth to one-third, while that of the railroad company ranged from one-third to one-half. The appellate court decided that the assessment of railroad property must be at the same percentage of the real value as that of individuals.

In C., B. & Q. R. Co. v. Board of Commissioners, 54 Kan. 781, 39 Pac. 1039, the railroad property was assessed at the true value, while the property of individuals and other corporations in Atchison county was assessed at 25 per cent. of its real value. The Constitution of the state required that the Legislature should provide for a uniform and equal rate of assessment and taxation, and the Legislature provided that all property should be assessed at its true value. The Kansas court said:

"The state board of railroad assessors valued the railroad property in Atchison county for taxation at its true value, but the city and township assessors of that county, by an agreement between themselves, assessed all the other property of the county at 25 per cent. of its true value. Thus, by concerted action, the statute of the state was flagrantly disregarded. * * * There has been a gross discrimination in the taxation of the railroad company. The law has not been observed. The taxes complained of are not equal and uniform."

The court awarded an injunction.

The Supreme Court of the United States, in Cummings v. Bank, 101 U. S. 153, 25 L. Ed. 903, said:

> "When a rule or system of valuation is adopt-
> ed by those whose duty it is to make the assess-
> ment, which is designed to operate unequally and
> to violate a fundamental principle of the Con-
> stitution, and when this principle is applied not
> solely to one individual, but to a large class of
> individuals or corporations, equity may proper-
> ly interfere to restrain the operation of this un-
> constitutional exercise of power."

In Atchison, etc., Ry. Co. v. Sullivan, 173 Fed. 456, 97
C. C. A. 1, the bill alleged that, while the plaintiff's prop-
erty was not worth more than $25,000 per mile, and the
state board assessed it at $14,800 per mile, or 55 per cent.
of its value, the assessor assessed other taxable property
in the county at not more than 25 per cent. of its actual
value; that the assessor omitted from assessment much
other property taxable in the county; that he did so pur-
suant to a rule adopted by the county officers, and did so
systematically and intentionally in order to make the
plaintiff pay a larger tax in proportion to the value of its
property than others who had taxable property in the
county; and that the state board transmitted to the coun-
ty an assessed value of $14,800 per mile of complainant's
railroad, when the proportion of the assessed value of its
property in the state which the board was required by the
statutes to certify to that county was $14,385.28 per mile.
The court held in this case, per Sanborn, Circuit Judge,
that the omission from the tax rolls of the personal prop-
erty mentioned, and which was done systematically and
intentionally, authorized the plaintiff to invoke the rem-
edy of injunction against the collection of a considerable
portion of the tax.

Judge Cooley, in 1 Cooley on Taxation (3d Ed.) 386,
quotes from Merrill v. Humphrey, 24 Mich. 170, and
says:

> "A discretionary power cannot excuse an offi-
> cer for refusal to exercise his discretion. His
> judgment is appealed to—not his resentments,
> his cupidity, or his malice. He is the instru-
> ment of the law to accomplish a particular end

through specified means, and when he purposely steps aside from his duty to inflict a wanton injury, the confidence reposed in him has not disarmed the law of the means of prevention. His judgment may, indeed, be final if he shall exercise it, but an arbitrary and capricious exertion of official authority, being without law, and done to defeat the purpose of the law, must, like all other wrongs, be subject to the law's correction."

See, also, to the same effect, Wells-Fargo & Co. v. Johnson, 214 Fed. 180, 130 C. C. A. 528, which cites most of the federal cases. Citizens' National Bank v. Board of Commissioners of Lyon County, 83 Kan. 376, 111 Pac. 496; Spokane & Eastern Trust Co. v. Spokane County, 70 Wash. 48, 126 Pac. 54; Langley v. Smith (Tex. Civ. App.) 126 S. W. 660.

It seems clear, therefore, that under proper circumstances a taxpayer or class of taxpayers who has been discriminated against in the matter of taxation may have equitable relief as to the excess over other taxpayers, notwithstanding the property has not been assessed as much as it should be under the taxing laws.

[3] In this connection a serious objection to the maintenance of this complaint appears. As before seen, the complaint contains no allegation that the complaining taxpayers appeared before any of the taxing officers, beginning with the assessor and ending with the state board of equalization, and attempted, except as hereinafter stated, to secure uniformity and equality for themselves in the matter of taxation. The allegation simply is that at the time of the assessment by the assessor of complainant's property at 50 per cent. of its value he failed and refused to assess the property of other taxpayers at a like valuation, and that he failed and refused to list other moneyed capital for taxation, and failed and refused to list more than two-thirds in number of the live stock in the county. It is further alleged that after the state board of equalization, by the general order heretofore set out, had fixed the valuation of the capital, surplus, and undivided profits of all banks in the state at 50 per cent. of

First National Bank of Raton v. McBride, 20 N. M. 381.

their value, the assessor of the county again failed and refused to put upon the tax rolls the omitted property, and failed and refused to assess all of the other property in the county at the same proportionate valuation as that fixed by the state board of equalization upon the complainants. The complaint contains no allegation that they requested the assessor to perform any of these acts, or that they appeared before either the county or state board of equalization, and requested that the omitted property be listed and taxed, and that the under-valued property be raised to a value proportionate to that of the complainants. One of the principal difficulties with this proposition is that the defendant in the court below failed to call attention to these facts by his demurrer, and the question is not even argued in the briefs for the defendant in this court. If this were an ordinary controversy between private persons, we would feel justified and required to ignore it. But the question in this case involves a proper understanding of the law of taxation as it is to be administered in this state, and the question is one of general public interest in which the state at large is concerned. Under such circumstances, we feel justified in discussing the question from the standpoint of the general welfare of the state. It is a general and well-recognized proposition that no taxpayer may appeal to a court of equity for relief against discriminatory taxation unless he has no legal or statutory remedy which is adequate, or unless he has first exhausted his legal or statutory remedy without avail. 2 Cooley on Taxation (3d Ed.) 1412; 2 Desty on Taxation, 661, 662.

In the case at bar it appears that, after the assessor had raised the valuation of the property of the complainants from 35 per cent. to 50 per cent. of its value, they appeared before the board of county commissioners, sittings as a board of equalization, which board reduced the valuation to 35 per cent. of the value of the property. It does not appear, however, that the plaintiffs ever demanded of the assessor, or of the county commissioners, that the omitted property be listed for taxation, and that all be raised to 50 per cent. of its value, thus equalizing the

burdens of taxation upon all, nor does it appear that the collector of the county, after the tax lists had been delivered to him, was ever requested by the plaintiffs to list any of the omitted property as he was authorized to do under section 4056, C. L. 1897. It thus appears that there was total lack of effort on the part of the plaintiffs to secure equalization by the means provided by the statute, except in one particular, viz., they attempted to have the valuations of their property reduced from 50 to 35 per cent. of its value, and succeeded in their effort in that behalf before the county commissioners; but they made no effort either before the assessor or before the county commissioners, or before the collector, to have the omitted property listed, or to have all of the property in the county valued the same as their own.

By chapter 103, Laws of 1907, the territorial board of equalization was clothed with the power to fix the value of shares of all national banks and other banking institutions in the territory; the tax to be imposed being in lieu of any taxes which otherwise might be assessed upon their property. By section 5 of article 8 of the Constitution, the state board of equalization succeeded to all of the power of the territorial board, until otherwise provided by law, and at the time the state board acted in this case there was no new legislation adding to or curtailing the state board's powers. At the time the state board acted (October 7, 1912) all of the acts of the assessor complained of were, presumably, known to the plaintiffs. They also knew that bank shares were within the exclusive assessing power of the state board, at least that part of that power which involves the fixing of values. At the time of the meeting of the board of county commissioners the plaintiffs knew that the state board had ordered that all bank shares should be assessed at 50 per cent. of the actual value of the capital, surplus, and undivided profits, and that, presumably, the assessor had so assessed them in accordance with the order. When they appeared before the county commissioners, however, so far as appears, they failed to request them to add the omitted property to the tax rolls, and failed to request a valuation of 50 per cent.

upon all of the other property in the county. On the other hand, they simply asked that their valuation be reduced to 35 per cent. because others were so assessed. It thus appears that they asked the board of county commissioners to do an unlawful thing, namely, to aid them in escaping a measure of taxation over and above what they had already escaped by reason of the action of the state board in assessing their property at 50 per cent. of the capital, surplus, and undivided profits. We do not think that this can be done.

As before stated, it is a general and well-established proposition that no taxpayer may appeal to a court of equity for relief against discriminatory taxation unless he has no adequate legal or statutory remedy, or unless he has first exhausted his legal and statutory remedies without avail. We take it that this proposition is settled. However, there is an exception or qualification that such legal or statutory remedies must be adequate to secure the redress required, and therefore it becomes necessary to examine our legislation as it appeared at the time this tax was laid. By section 4048 of the Compiled Laws of 1897 it is provided that the board of county commissioners shall constitute a board of equalization for the revising, correction, and completion of the assessment roll. At its first meeting as such board of equalization it has power to "supply omissions in the assessment roll, and, for the purpose of equalizing the same, may increase, diminish or otherwise alter and correct any assessment or valuation, except where such valuation is fixed by law." At either the first or second meeting of the said board of county commissioners they were authorized and required to "hear appeals and complaints of those dissatisfied with the assessment by the assessor, and shall decide the same, as in their judgment is proper and right." The same section provides that any taxpayer dissatisfied with the decision of said board may appeal to the territorial board of equalization, and that said territorial board of equalization has full power to act in the premises, "either in increasing, diminishing, exempting, or otherwise altering and correcting any assessment or valuation so appealed from." This

section is a part of chapter 73 of the Laws of 1887. By section 2636, C. L. 1897, which comes from a later act (chapter 12, Laws 1897) the territorial board of equalization is given the power:

> "To hear and determine any appeals taken, as now provided by law, and also any appeals taken by the territory, or any county, which appeals are hereby authorized to be made and taken in the same manner as other appeals from assessments for taxation are now allowed, and it shall be the duty of the solicitor general of the territory to take an appeal from any action of the board of county commissioners on behalf of the territory and * * * county whenever he shall be requested so to do, by a petition in writing signed by three responsible taxpayers of any county.
> * * * *"

Under these two sections, it is perfectly apparent that any taxpayer who believes that he is being discriminated against may appeal to the board of county commissioners, as the board of equalization, and, if he knows of any omitted property, as, it is presumed, plaintiffs in this case knew, to request said board to list the omitted property for taxation. If he knows of any valuation for taxation at a less proportion of actual value than the valuation upon his property, he may request the county commissioners to raise the valuations of the other taxpayers to an equality with him. The quotation from section 4048 does not seem to confine an appeal to the territorial board of equalization to a complaint of the taxpayer on his own assessment, but he may complain of undervaluations of other taxpayers, and section 2636 clearly gives the right of appeal on behalf of the territory or any county from any undervaluations of any classes of taxpayers. In other words, the appeal to the territorial board of equalization is not confined in its scope to overvaluation of any one or more taxpayer's property, but includes the question of undervaluation of the property of other taxpayers. It therefore becomes apparent that the plaintiffs in this case had a complete and adequate statutory remedy for all of their

grievances of which they complain in this suit. It may be suggested in this connection that to require a taxpayer to present all this data to the taxing officers would impose upon him a difficult, if not an impossible, task, and involve him in the necessity of stating the whole tax situation of any given taxing district. But this is certainly no valid objection. The taxpayers, plaintiffs in this case, had they appealed to the tax officers, would be subjected to no greater burdens in the way of accumulating evidence than they were subjected to in this very suit. The same facts were presented in this suit which could have been presented to the taxing officers, and, presumably, the plaintiffs were at the time they were assessed at 50 per cent. on the dollar as well informed as to the facts as they were when they filed the complaint in this case. Under these circumstances the plaintiffs have no basis upon which to invoke the aid of a court of equity. There is no principle of law or equity of which we are aware whereby a taxpayer can ask a court of equity to aid him in defeating the payment of a just tax, simply because others have succeeded in evading a just proportion of their tax, unless he first attempts to remedy the evil by application to the proper taxing officers. As has been pointed out, plaintiffs in this case were taxed at 50 cents on the dollar, and desire to be taxed at 35 cents on the dollar, thereby evading 65 per cent. of their just taxation, upon the theory that they should be reduced to the same proportion of values as the other taxpayers in the county. As before seen, under proper circumstances, and when the taxpayer has exhausted all his legal and statutory remedies, or where he has no adequate ones, he may come into a court of equity and obtain relief simply because the courts have no power to relieve him against discriminatory taxation except by reducing him to a level with the other taxpayers. This position is supported by what we consider good authority.

Thus in Bagley Elevator Co. v. Butler, 24 S. D. 429, 123 N. W. 866, the complaining taxpayer complained because its elevators were taxed at a higher proportion of their value than other elevators in the state, but it appeared that all of its elevators were taxed at less than

their true value, which was required by the South Dakota statute. The court said:

"What, then, was the remedy of appellant? Under our law it is the duty of the assessors to assess property at its true value, and the duty of all equalization boards to correct errors and inequalities by raising property to its true value, where it has been valued too low by the assessor. Therefore the remedy of appellant was to ask the town board and the county board to equalize taxation by raising the values of other property, and not by lowering the value of appellant's property. From the complaint it simply appears that the town boards were asked to equalize values, but it clearly appears that the county boards were asked to equalize values by lowering the values of appellant's property, or, in other words, such board was asked to disobey the laws of this state. This court will take judicial notice that the taxing officers of this state, from the assessors to the state board of equalization, absolutely disregard the clear mandate of the law in placing values upon property for taxation purposes, but that is no reason why the courts of this state should connive at such acts or become active parties thereto. When a party whose property, though assessed at less than its value, is assessed much higher than that of other taxpayers, shall have requested the several boards to equalize taxes in the manner fixed by statute, to-wit, by raising the assessment of all property to its actual value, and such boards shall have refused or failed to do their clear duty under the law, then, and only then, let such party apply to the courts for relief."

This case was followed in Sioux Falls Savings Bank v. Minnehaha County, 29 S. D. 146, 135 N. W. 689, Ann. Cas. 1914D, 910. In that case the state board of equalization ordered, among other things, that certain classes of property should be assessed at certain proportions of their

actual value, and that other property, except bank stock, should be assessed at one-third of its actual value, and that bank stock should be assessed at 40 per cent. of its actual value. The assessor followed out the instructions of the state board, and the complaining taxpayers brought a suit to restrain the collection of the tax on the ground of intentional discrimination against banks. The defendants demurred to the complaint, which demurrer was overruled, and the defendants appealed. The court held, in accordance with the Butler Case, supra, that it was the duty of a complaining taxpayer to seek equalization by increasing the valuations of other taxpayers, rather than to seek equalization by decreasing the valuations upon his own property. They further held that, by reason of a statutory provision, there was a limitation upon the amount of increase of valuations in any one year of over $3,000,000, and that therefore the request of the taxpayers made to the state board to equalize the assessment by increasing all property in the state to full value was unwarranted. The court points out that the request to the state board should have been to equalize valuations within their powers as fixed by law, leaving the exact method to the state board of equalization. Then, had the state board persisted in a willful and intentional discrimination against banks, they would have exceeded their jurisdiction, in which event the remedy could be corrected upon a writ of certiorari. It is upon this ground that the court refused the taxpayers the right to maintain a suit in equity because they had failed to pursue their statutory remedy.

In Burlington, etc., R. R. Co. v. Board of County Commissioners, 10 Neb. 211, 4 N. W. 1016, the plaintiff complained of unequal assessment by reason of certain exemptions which had been allowed in the assessment of lands which had been planted to trees, and which exemption was not warranted by law, and was not extended to lands of plaintiff, and the court said:

"Where a taxpayer feels himself wronged,, either because his own property is valued too high, or that of others too low, or omitted altogether from the lists, a summary and inexpen-

sive remedy is provided by a resort to the county board of equalization, a tribunal created expressly to hear complaints and make corrections of the assessment roll, preliminary to the levy of taxes, to the end that every person shall bear his due proportion, and no more, of the public burdens. The plaintiff, having entirely neglected to bring the matter of these deductions and exemptions to the attention of this board, is in no situation to be heard in complaint now. Nor does it matter that some of the deductions were made, as the evidence shows, by the board of equalization. This was error to be sure, but, having occurred in the determination of a question of which the board had jurisdiction, their decision must stand until corrected in a proper proceeding."

In the First National Bank v. Steenson, 25 N. D. 629, 146 N. W. 1061, the assessor assessed the holders of shares of stock in the plaintiff bank at 81 per cent. of its full cash value, and the property of other moneyed capital was assessed at only 35 per cent. of its full cash value, and such discrimination was willful. The court said:

"Another consideration, in our opinion, is equally decisive of this case. It is not claimed that the plaintiff, or any of its said shareholders, ever presented their grievances arising upon the alleged unequal and overvaluation of said shares of capital stock to either the board of review of the city of Hillsboro or the board of equalization of Traill county, or to the state auditor, all of which officers are expressly empowered by the revenue laws of this state to hear and redress grievances of the character set out in this complaint."

In First National Bank v. Holmes, 246 Ill. 362, 92 N. E. 893, the assessor valued the real estate at 43 per cent. of its actual value; the board of review raised the valuation of personal property, and the valuation finally fixed was practically the same as all property in the township,

except real estate.  The question presented to the circuit
court by the bill was whether the valuation by the board
of review was a wrong to the plaintiff for which a court of
equity ought to afford a remedy.  The claim for the ap-
pellee was that equity required a reduction of the value
fixed by the board of review to the valuation of real estate
in the township.  The court adopted that view, and made
the reduction, the effect of which was that it permitted
the complainant to pay less taxes in proportion to the
value of the shares of stock than other taxpayers assessed
on the same kind of property  The court said:

> "The illegality was not in valuing all the prop-
> erty of the township at its fair cash value, and,
> as between the taxpayers in the township, in valu-
> ing the real estate at a lower rate proportionate-
> ly than personal property.  It is not within the
> power of the Legislature to provide that differ-
> ent classes of property shall be valued different-
> ly, and, if moneys, mortgages, bonds, or securi-
> ties are valued at a different proportion of their
> full value or on a different basis from other
> property, the Constitution and the law are both
> violated.  The complainant would have had just
> cause to object that lands and lots in the town-
> ship of Urbana were illegally valued far below
> their actual value so as to work an injustice to
> owners of other property, but the shares of stock
> of complainant were subject to taxation, and the
> assessment was made in conformity to the mode
> prescribed by the statute, and the valuation of
> the shares by the board of review was consider-
> ably below the actual value.  A court of equity
> cannot intervene in behalf of a taxpayer on the
> ground that the property of others has been val-
> ued too low.  People v. Lots in Ashley, 122 Ill.
> 297, 13 N. E. 556.  The complainant was not
> without a remedy at law to compel a perform-
> ance by the assessor or board of the duty declar-
> ed by the statute, so that one class of property
> should not be assessed on a lower basis than the

property of the complainant, but the court could not give the relief asked for by the bill without doing an injustice to all other owners of similar property who were assessed on substantially the same basis of valuation, and the shares of stock were finally valued by the board of review at much less than they should have been valued under the law. The complainant had no equitable right to have the reduction of the valuation fixed by the assessor."

In this cause it is to be observed, as before pointed out, that the sole assessing power of bank shares was in the state board of equalization, and they made an order taxing all banks in the state at a valuation of 50 per cent. of the capital, surplus, and undivided profits. If a suit of this kind can now be maintained by one or more banks in Colfax county, and their valuations be reduced from 50 per cent. to 35 per cent. by a decree of a court of equity, then and in that event the court becomes a party to a wrong against all of the other banks in all of the other counties of the state. This order of the state board was a general order, and affects all banking institutions. They were therefore all assessed at 50 per cent. of their valuation. The wrong which would be committed by such a decree of the court is of the same quality and character, although, perhaps, of a lesser degree, under the facts pleaded in the complaint, as the wrongs committed by the tax officers of Colfax county or the state board of equalization. The courts can take no such position.

It follows that the plaintiffs in this case have stated no cause of action in equity, and the judgment overruling the demurrer will be reversed, and the cause remanded to the district court, with leave to the parties to plead further if they shall be so advised.

ROBERTS, C. J., and HANNA, J., concur.