85 P.2d 90

**VERMEJO CLUB v. FRENCH,**
County Assessor.

No. 4364.

Supreme Court of New Mexico.

Nov. 29, 1938.

J. D. Mell, of Santa Fé, for appellant.

C. C. McCulloh, of Santa Fé, for appellee.

HUDSPETH, Chief Justice.

The question for decision in this case is whether the state is bound the same as the taxpayer by the classification and valuation of real estate duly fixed and determined by the taxing authorities from which no appeal is taken.

The Vermejo Club, appellant, is the owner of 176,984 acres of land in school district No. 20, Colfax County, which it returned in the year 1934 without mentioning the fact that there was growing timber thereon or listing in its tax schedule any part thereof as timber land. The taxing authorities followed appellant's tax schedule in classifying and valuing said land. It was so assessed for the years 1934, 1935 and 1936, but for the year 1937 the assessor added "timber, $75,000." Appeals were duly taken by appellant from the action of the assessor and from the order of the Board of County Commissioners, sitting as a board of equalization, which affirmed the act of the assessor. The State Tax Commission, after considering the appeal of the

Vermejo Club, on June 25, 1937 ordered the assessor to reclassify enough acreage of appellant's land in school district No. 20 to make a total increase in value of $75,000; and dismissed the appeal of appellant; whereupon appellant brought this suit praying that the assessor be restrained from carrying out the order of the State Tax Commission.

Paragraphs 9 and 10 of appellant's complaint state:

"9. That the attempted additional assessments against plaintiff's property for the years 1937 are illegal, void and contrary to Chapter 86 of the 1933 Session Laws of the State of New Mexico as it is an attempt to change values, within four years, which values were finally fixed by the assessment of 1934, and unless restrained by the court defendant as Assessor of said Colfax County will imperil plaintiff's lands and property with an illegal assessment and with the extension of taxes thereon.

"10. That plaintiff has no speedy and adequate remedy at law."

The return to the order to show cause and answer to the complaint admits the allegations of the fact set out above and that the assessor intends to carry out the order of the State Tax Commission. Paragraphs 5, 6, 7 and 8 of said return state:

"Denies each and every allegation contained in paragraph 9 of plaintiff's complaint.

"And further answering said complaint and as a further return to the said order to show cause alleges and shows to the Court that as defendant is informed and believes, there is in excess of one hundred million board feet of merchantable timber now growing upon the lands of the plaintiff herein; that said timber, or a portion thereof, has been sold to one W. E. Burke, and that said Burke is now engaged in cutting and removing said timber; that said lands belonging to the plaintiff upon which said timber is growing were not classified as timber lands for the year 1934 through error of the Tax Assessor of Colfax County; that the reclassification ordered by the State Tax Commission and the Additional assessment placed upon plaintiff's property by this defendant represents the actual value of the property of the plaintiff.

"That plaintiff appealed from the additional assessment for the year 1937 to the Board of County Commissioners of Colfax County sitting as a board of equalization, and further appealed from the board of equalization to the State Tax Commission; that said appeal was prosecuted in accordance with the provisions of Chapter 86 of the Session Laws of the State of New Mexico for the year 1933; that the order of said Tax Commission rendered upon said appeal is final and binding upon this plaintiff; that the questions sought to be raised by said complaint are now res judicata.

"And making further return to the order to show cause herein defendant shows to the Court that said Chapter 86 of the 1933

Session Laws of the State of New Mexico, in so far as the same purports to prevent the reclassification ordered by the State Tax Commission contravenes Section 3 Article 8 of the Constitution of the State of New Mexico is unconstitutional and void in that the said Chapter 86 of the 1933 Session Laws would exempt from taxation for the years 1935, 1936 and 1937 the property of the plaintiff not specifically exempted in the Constitution of the State of New Mexico."

The district court heard the matter, discharged the order to show cause and dismissed the complaint. This appeal follows.

The allegation of paragraph 10 of the complaint that the plaintiff has no speedy and adequate remedy at law was not denied and apparently counsel desired and obtained a ruling on the constitutional question raised and the construction of the statutes involving the right of the State Tax Commission to set aside, years later, a classification and valuation of land duly fixed, and order a reassessment on a different valuation.

Section 1 of Article 8 of the New Mexico Constitution was amended under Joint Resolution No. 10 of the Legislature of 1913, see Laws 1913, p. 170, but the provision as to equality and uniformity was not materially changed. It now reads as follows: "Taxes levied upon tangible property shall be in proportion to the value thereof, and taxes shall be equal and uniform upon subjects of taxation of the same class."

The first six sections of Ch. 86, Laws 1933, are as follows:

"Section 1. Hereafter all real property subject to assessment and valuation by the assessors of the different counties, including grazing lands, the value of which is fixed by the State Tax Commission, shall be appraised and valued for purposes of taxation once every four years, the first of such valuations to be in the year 1934, the next in the year 1938, and thereafter each four years.

"Sec. 2. All such property shall be assessed and valued at actual market value in the manner and by the authority as now provided by law, except that the value of all such property as finally fixed in the year 1934, and each succeeding fourth year thereafter shall be final and binding on all taxing authorities and all owners of such property for four successive tax years, except as to right of appeal. Actual market value of property is hereby determined and fixed to be that price or worth represented by the amount of money, or its equivalent, which would be received therefor at a normal sale in or at a normal market.

"Sec. 3. Each of the three years following any years in which its value is fixed, the assessor shall add to the value of all real property the actual value of any or all improvements which may be placed thereon during the preceding year, and shall deduct from such value the value of all improvements which may have been destroyed or removed during the preceding year.

"Sec. 4. Whenever any real property is patented or in any other manner becomes subject to taxation, the same shall be added to the roll for the next year following date of patent and its value fixed and determined in the same manner as other real property, which value·when so fixed shall be final and binding on all taxing authorities and all owners of such property until the next year in which general real property values are fixed.

"Sec. 5. Whenever any real property is found to have been omitted from the tax roll of any year in which real property values were fixed, its value shall be fixed and determined and such value, when so fixed, shall be final and binding on all taxing authorities and all owners of such property until the next year in which general real property values are fixed; and such omitted property so valued shall be listed for the number of years omitted and in the manner as provided by law.

"Sec. 6. In fixing the value of real property under the provisions of this Act all taxing authorities shall fix the same as near as may be at the actual market value for the period for which such value is fixed."

The first part of Sec. 1 of Ch. 104, Laws 1933, reads as follows: "The Board of County Commissioners of each ˙County shall constitute a Board of Equalization for the revision, re-valuation, correction and completion of the assessment rolls. It shall, at its meeting on the first Monday in April, have power to supply omissions

in the assessment roll, revise and re-value property, and for the purpose of equalizing the same, may increase, diminish or otherwise alter and correct any assessment or valuation, except where such valuation is fixed by Law or by the State Tax Commission. * * *"

An administrative body has such authority ˙and only such authority as is given by law. Courts of equity alone can set aside judgments for fraud in procuring them. The administrative body was given no authority to set aside its own judgment, but on the other hand, was prohibited from doing so.

"A reviewing board or officer is not empowered to increase valuations for assessment unless authorized to do so by statute." 61 C.J., Taxation, sec. 1022.

"In the absence of statutory provisions conferring the power of reassessment on boards or officers, they have no such power, and any attempt at reassessment is unauthorized and void." 61 C.J., Taxation, sec. 1024.

"Changes of periodical general assessment during continuance of period. In a number of jurisdictions there are statutes providing for a periodical general assessment of property and further providing that the valuations ·then placed on property shall, to a certain extent, be taken as the valuation for assessment purposes until the next periodical assessment, save as certain described changes in the condition of the property shall authorize ˙a change of the valuations; and, where there

are such statutes, the existence and extent of power in the reviewing boards to alter valuations between the times when periodical assessments are made depend on the terms of the statutes. Similarly, where by statute a particular assessment is approved and the valuation thereby adopted is declared to be the basis of assessment for a certain number of years, except for subsequent changes according to law, it has been held that a reviewing board cannot alter the valuation of property as fixed by such assessment during the period for which the assessment was approved. * * *

"Effect of invalid alteration. If a board or officer attempts to alter a valuation but the change made is invalid, the valuation placed on the property before the attempted change remains the one at which the property is to be assessed. * * *" 61 C.J., Taxation, sec. 1021.

It is said that Ch. 86 quoted above was taken from the Laws of Illinois. In Crozer v. People, 206 Ill. 464, 69 N.E. 489, where the facts were similar to those in the case at bar, it was held that the taxing officials were without authority to reassess and raise the valuation for the years intervening the quadrennial assessment years. The Illinois Act was later amended. Smith-Hurd Stats.Ill. c. 120, § 280 et seq. See People ex rel. Gill v. Jastromb, 367 Ill. 348, 11 N.E.2d 368. No doubt our legislature will amend Ch. 86, but it is not for the judiciary to legislate. Our Act confers power on assessors to appraise and value for tax purposes once every four years the real property of their respective counties, beginning with 1934, and such assessed valuations "shall be final and binding on all taxing authorities and all owners of such property for four successive tax years, except as to right of appeal." Section 2, Ch. 104, quoted above was enacted at the same session of the legislature and must be construed as a part of Ch. 86, as they are of the same subject-matter and are to be construed in pari materia. "All the enactments of the same legislature on the same general subject matter are to be regarded as parts of one uniform system. Later statutes are construed as supplementary or complimentary to the earlier enactments." Black on Interpretation of Laws (2d Ed.), sec. 104.

Ch. 104 confers power on the county equalization board to revise and revalue property "except where such valuation is fixed by Law or by the State Tax Commission." Sec. 1 of Ch. 86, Laws 1933, fixes the values of real estate subsequent to the year in which the value of all real estate is fixed each fourth year. And it is so fixed that it cannot be changed by any taxing authority. Construing the two acts together, Ch. 104 confers no power or authority on taxing officials to alter for intervening years the valuation of real estate fixed for the four year period. It is thus fixed by law.

The question is important since the language in Sec. 2 of Ch. 86 is as strong in its restraint of taxing authorities and as to the binding effect of a valuation

finally fixed as any law enacted since statehood. And if this judgment is sustained, thousands of other tracts of land may be reassessed as omitted property for many past years. See Southern Pac. R. Co. v. State, 34 N.M. 479, 284 P. 117; Oden Buick, Inc., v. Roehl et al., 36 N.M. 293, 13 P.2d 1093; 61 C.J., p. 761.

A different legislative policy prevails in some of the older states to that which has been consistently followed in this jurisdiction. It is forcefully stated by the Supreme Court of Minnesota in State v. Weyerhauser, 72 Minn. 519, 75 N.W. 718, that " * * * There is no distinction in principle between a case where land has wholly escaped taxation by reason of its omission from the assessment roll and one where, by reason of a fraudulent or grossly inadequate assessment, it has escaped a part of its just share of the public burdens." [page 719.]

And in Re Taxes for Itasca County, State v. Weyerhauser et al., 68 Minn. 353, 71 N.W. 265, the same court said as follows [page 268]: "It is true that most of the decisions upon this question of reassessing property omitted from assessment and taxation relate to cases where the omission has been entire, and not partial, as in the case at bar; but such property which was grossly undervalued comes within the same reason for reassessing the same as though they had been entirely omitted. The constitution requires that taxes to be raised in this state shall be as nearly equal as may be, shall have a cash valuation, and be equalized and uniform throughout the state. The true intent of the law is that each dollar's worth of property shall bear its just proportion of the public burdens, and when such property has escaped assessment to such an extent as to be deemed gross undervaluation, it has been omitted from the just requirements of the law. It is the value of the property, as well as the description of the property which has been omitted from assessment and taxation. * * *"

Different views were expressed in Delta Land & Timber Co. v. Police Jury et al., 169 La. 537, 125 So. 585 and Miller v. Copeland's Estate, 139 Miss. 788, 104 So. 176.

In State v. Jemez Land Co., 30 N.M. 24, 226 P. 890, after holding that growing timber was part of the realty, we said: "Following the action of the county assessor and board of equalization, appellee found its property, consisting of 110,308 acres of land, on the tax rolls for 1919 classified as 90,308 acres of grazing land, valued at $1.25 an acre, and 20,000 acres of timber land, valued at $12.50 an acre. Thereupon appellee appealed to the state tax commission from the valuation of said timber lands as excessive, but did not appeal from the classification or valuation of the grazing lands. Notwithstanding there was no appeal except as to the valuation of the timber land, the state tax commission ordered the whole 110,308 acres to be valued and assessed at $1.50 per acre, and added thereto the valuation of 400,000,000

feet of stumpage at 40 cents a thousand feet. Appellee refused to pay the taxes so assessed, and, upon suit being brought for the recovery thereof under the provisions of chapter 133, Session Laws of 1921, defended on the ground that the tax commission was without jurisdiction to increase the valuation of the 90,308 acres of grazing land, as to which no appeal had been taken, and was without jurisdiction to levy an assessment on said 400,000,000 feet of stumpage, apart from the land, and that, if it should be mistaken as to the jurisdictional defenses, the action of the state tax commission resulted in an excessive valuation of its property and constituted a discrimination against the appellee. By its answer appellee alleged its readiness and willingness to pay taxes on said real estate at such reasonable value as the court might fix, and contended for a valuation of $1.25 an acre on the grazing land and $4 an acre on the timber land. The state demurred on the ground that the allegations of the answer were insufficient in law to authorize the granting of the relief asked for. The demurrer was overruled, and thereupon the state replied, denying generally the new matter in the answer. The court heard evidence and concluded, as a matter of law, that the state tax commission had no power to ignore the appeal as to such 20,000 acres of timber land, and had no power, without appeal as to the 90,308 acres, to make a different classification or assessment, or pass on questions not brought up by appeal, and was without jurisdiction to assess the whole of the land separately at $1.50 an acre, and to assess separately the timber growing thereon. * * *" and that "Had the state desired a review of such other valuations, the statute gave the same right of appeal to the taxing officers as was given to the taxpayer. It follows that the order of the state tax commission increasing the valuation of 90,308 acres of grazing land from $1.25 an acre to $1.50 an acre was void as having been made without jurisdiction, and could not be enforced. The valuation of $1.25, as previously fixed, should stand, and the court was correct in so holding. * * *"

The court also held "that the standing timber was a part of the realty for the purpose of taxation, and its value an element to be considered in ascertaining the true value of the land." and on rehearing the court said: "On motion for rehearing the appellee challenges the correctness of that construction and, after hearing argument, and, further considering the facts as disclosed by the record, we are agreed that we were in error in our first conclusion, and that what the tax commission attempted to do was to revalue the entire acreage, including the 90,308, as well as the 20,000 acres, and to make a separate valuation of 400,000,000 feet of growing timber without definitely locating that timber on the 20,000 acres. While the 20,000 acres constituted a part of the 110,308 acres which the commission undertook to value, we have no means of knowing what part of that value should be assigned to the former. But that was the only subject-matter before the commission for valuation. The order

of the commission, then, by direction of which the tax roll was amended, and by which the commission undertook to dispose of the appeal, deals wholly with a subject-matter not involved in the appeal, and the commission was without jurisdiction to make it. Since such order was made with-out jurisdiction, it is void, and did not and does not dispose of the appeal which was pending before the tax commission, and the appeal, being undisposed of, is still there pending. The result is that the valuation of $1.25 an acre on the 90,308 acres of graz-ing land stands for the reasons stated in our original opinion."

The court held that although a part of the 400,000,000 feet of timber might be on the 90,308 acres, that tract which had been listed as grazing land could not be reclas-sified and revalued, because the State Tax Commission was without jurisdiction—the state having failed to exercise its right to appeal. We find the same situation in this case. The "item" of land was appraised and valued and no appeal taken therefrom.

 Appellee alleges that it was due to "error of assessor of Colfax County". It seems clear that throughout the history of the state the responsibility for the proper classification and valuation of real estate has been upon the taxing officials, although all our taxation statutes have provided penalties against property owners for fail-ure to make returns of property for taxa-tion, including the statutory penalty for perjury in the verification of tax schedules. The statutes quoted above are in conform-ity with Sec. 1 of Article 8 of our Con-stitution which has been considered by us many times, including the following cases: Scholle v. State Tax Commission, 42 N.M. 371, 78 P.2d 1116; In re Blatt, 41 N.M. 269, 67 P.2d 293, 110 A.L.R. 656; State ex rel. Atty. Gen. v. State Tax Commission, 40 N.M. 299, 58 P.2d 1204; First State Bank of Mountainair v. State Tax Commission, 40 N.M. 319, 59 P.2d 667; State ex rel. Taylor v. Mirabal, 33 N.M. 553, 273 P. 928; First National Bank of Raton v. Mc-Bride, 20 N.M. 381, 149 P. 353; South Spring Ranch Co. v. Board of Equaliza-tion, 18 N.M. 531, 139 P. 159. In State ex rel. Taylor v. Mirabal, supra, 273 P. 932, after commenting upon "glaring inequali-ties" we quoted from Northwest Auto Co. v. Hurlburt, 104 Or. 398, 207 P. 161, the fol-lowing: " 'There never was, and perhaps never will be, any system of taxation de-vised that will work even and exact jus-tice in every instance. The best result that the law maker may hope to attain is such an approximation to uniformity as will work out justice in the great majority of cases.' "

Some of the cases listed above show "glaring inequalities" and flagrant viola-tions of the constitutional provision, but we have not found that under any of our tax statutes they did not work out justice in the majority of the cases. In First State Bank of Mountainair v. State Tax Commission, supra, 59 P.2d 669, we said: "Taxation is a legislative function without any limitation except such as is imposed by constitutional provisions. The state tax commission is the administrative body

which has been designated by the Legislature to secure uniformity throughout the state on property of certain classes, to act for the state in making certain assessments. The Legislature has taken from the local assessors the right to determine the valuation of certain property. For example, railroad, telegraph, telephone, and transmission or pipe line company property are assessed by the tax commission. Also shares of the capital stock of all banks, trust, and mortgage loan companies. Also mineral property; the shares of mutual building and loan associations and savings and loan associations. Comp.St.1929 § 141-502. The Legislature also vested in the tax commission the power to determine and fix the actual valuations of the different classes of grazing lands and live stock. Comp.St.1929 § 141-510."

In Re Blatt, supra, we held that while the court could vacate an illegal assessment it had no authority to revalue the property or assess taxes, that being the duty of the taxing authorities. It is apparent that the policy long followed by this court of interfering as little as possible with the taxing authorities is the proper one, and while inequalities have been brought to the court's attention it has not appeared that the State Tax Commission was not endeavoring to properly solve the extremely difficult problem of equalizing taxes. In the early case of First National Bank of Raton v. McBride, supra, the court was confronted with the realities. In the opinion rendered May 24, 1915, Mr. Justice Parker, speaking for the court,

said: "The plaintiffs allege that, in pursuance of a notice by the county assessor that all property must be returned at 35 per cent. of its actual value, they returned their property at 35 per cent. of its actual value, while many other taxpayers of the county returned their property at a much less rate. * * * The proposition involved is one of much difficulty. When a taxpayer is required to return his property at its full cash value for taxation purposes, and where he has returned it or has been taxed upon it only 50 cents on the dollar, it is difficult to understand how he can appeal to a court of equity for relief simply because some other taxpayers have been more fortunate and have escaped in a greater degree the just taxation to which their property was subject. * * *" 149 P. 354.

█ It is matter of common knowledge that at that time the poorer counties were compelled to list property at a higher percentage of its value in order to raise sufficient revenue for the county government— there being a limitation on the county tax levy.

█ These were and still are problems for the legislative and executive branches of the government, and the intent of the legislature in enacting the statute quoted above relative to the reassessment of property for past years must be considered. If we should abandon the doctrine that the state is bound by the values as finally fixed where there is no appeal from an assessment, and adopt the doctrine of the Weyerhauser Cases quoted above, thousands of

homesteads on which trees are growing which were assessed as grazing land would be subject to reclassification and reassessment for many past years. So would irrigated lands under government projects where the acreage listed on tax rolls for the past years was less than the water right claimed under the irrigation project. In fact all real 'estate "grossly undervalued" in past years would be subject to reassessment as omitted property, although taxes assessed had been paid. Government funds available as loans for building homes and other purposes on first liens would not be loaned in this state in many instances because our lands might be reassessed for past years and the state tax lien would be the first lien. The abstract of title showing taxes paid would no longer satisfy the lender or prospective purchaser. Whether the lands had been "grossly undervalued" during past years could not be ascertained from the records in most cases.

The assessor would have power under that interpretation of the statute in connection with the statute authorizing the assessment of omitted property which might be used for political purposes, as the power of taxing officials was used in some instances in territorial days resulting in what was familiarly known as the "assessment cinch".

A late work on economics, after commenting upon the various kinds of exchanges, including the enormous volume of business which centers around lands and buildings, says: "It almost becomes a truism, then, to say that the welfare of the whole society varies with and is determined by the volume of exchanges—that is, of business—that goes on within it. * *" Harry Scherman's The Promises Men Live By, p. 403.

We cannot credit the legislature with intending to bring such a calamity upon the people of the state as would follow from such a construction of the law.

■ The question of the right to injunctive relief presents a more difficult question. In Lougee v. Bureau of Revenue, 42 N.M. 115, 76 P.2d 6, we held that we were reluctant to interfere with the collection of taxes by injunction and would not do so even though the tax was void except in special circumstances. In this case the taxes legally assessed have been paid. We are not restraining the collection of a tax, but the making of a void assessment—an act prohibited by statute.

"Where the statute prescribes specifically how an act shall be performed by a board, or prohibits its performance under certain conditions, an act in direct violation thereof is absolutely void." 46 C.J., Officers, p. 1034, § 296.

In Oden Buick, Inc., v. Roehl, supra, we referred to Cooley on Taxation (4th Ed.), § 1659, which follows: "Restraining assessment. An injunction against the assessment of a tax is to be distinguished from an injunction against the collection of a tax. Ordinarily an injunction will not be granted to restrain an assessment, especially in case of mere irregularities, or where there is a plain and adequate remedy at law by

appeal, certiorari, or other proceedings; but the writ may be granted in some cases where the assessment is under an unconstitutional statute, or on unconstitutional principles, or the property to be assessed is exempt, or the assessment would for other reasons be clearly unwarranted. Likewise the writ will be granted where necessary to prevent a multiplicity of suits, or to prevent irreparable injury to complainant, or to prevent a cloud on the title, where there is no adequate remedy at law."

A method is not provided by statute whereby a taxpayer who is aggrieved by the action of the State Tax Commission can appeal to the court. In re Blatt, supra.

■ This in a sense is not an assessment or a mere irregularity, but an attempt at a reassessment or the increase of the valuation duly fixed in the face of the prohibitory statute. The result would be to cloud the title of appellant and if all other offenders of the same class were treated in the same way the result would be a multiplicity of suits.

It has been suggested in argument that the assessor of Colfax County with equal authority might announce that he proposed to list on the tax rolls the landowners referred to in the case of First National Bank of Raton v. McBride, supra, who escaped with the payment of 35 per cent. of the taxes justly due the state, for the additional or 65 per cent. still due for that year. Other assessors throughout the state might with equal authority list as omitted prop-erty all lands "grossly undervalued" in past years.

We are constrained to hold that under these circumstances the trial court should have granted the relief prayed for.

For the reasons stated the judgment will be reversed and the cause remanded for further proceedings in conformity herewith. It is so ordered.

BRICE and ZINN, JJ., concur.

BICKLEY, Justice (dissenting).

The plaintiff corporation (appellant) is owner of substantially 176,000 acres of land in Colfax County. In 1934 it listed said property under the following classification:

"Classification of Lands

| Class | Acres | at | Value |
|---|---|---|---|
| Agriculture | 1600 | 4 | 6400.00 |
| Vega | 40 | 20 | 800.00 |
| Coal | 200 | 10 | 2000.00 |
| Grazing Class 'C' | 35029 | 1-1/2 | 52545.00 |
| Grazing Class 'E' | 105085 | 1 | 105085.00 |
| Grazing Class 'G' | 35029 | .50 | 17515.00 |
| Total (Column 1 Tax Roll) | | | 184345.00" |

The property list was subscribed and sworn to by the corporation manager, which oath contained the usual statement that "the classification of lands * * * as is herein set forth, is true and correct in all particulars."

For the year 1937 the corporation made return of a similar list of land with the identical classifications, to which the County Assessor added "Timber 75000.00".

The taxpayer appealed to the Board of County Commissioners of Colfax County,

sitting as a Board of Equalization, praying that the assessment for 1937 on account of timber be removed, which prayer was denied. The plaintiff taxpayer appealed to the State Tax Commission, which after hearing the evidence and argument of counsel ordered the assessor to reclassify enough acreage of land of plaintiff so as to make a total increase in valuation as a result of such reclassification in the sum of $75,000 for the year 1937, and dismissed the appeal of plaintiff. Thereupon the taxpayer filed suit praying a restraining order against the assessor's carrying into effect the order of the tax commission.

The assessor made return to the order to show cause, containing certain admissions and denials, and affirmatively alleged: "And further answering said complaint and as a further return to the said order to show cause alleges and shows to the Court that as defendant is informed and believes, there is in excess of one hundred million board feet of merchantable timber now growing upon the lands of the plaintiff herein; that said timber, or a portion thereof, has been sold to one W. E. Burke, and that said Burke is now engaged in cutting and removing said timber; that said lands belonging to the plaintiff upon which said timber is growing were not classified as timber lands for the year 1934 through error of the Tax Assessor of Colfax County; that the reclassification ordered by the State Tax Commission and the Additional assessment placed upon plaintiff's property by this defendant represents the actual value of the property of the plaintiff."

These allegations are not denied by plaintiff.

The District Court heard the matter and discharged the order to show cause and dismissed the complaint, from which action of the court the taxpayer appeals to this court.

Ch. 86, L. 1933, is "An Act to Provide for the Appraisement and Assessment of Real Property Prescribing the Method Thereof and Repealing Acts in Conflict Herewith." Sec. 1 provides that certain real property "shall be appraised and valued for purposes of taxation once every four years, the first of such valuations to be in the year 1934, the next in the year 1938, and thereafter each four years."

Sections 2, 3 and 5 are as follows:

"Sec. 2. All such property shall be assessed and valued at actual market value in the manner and by the authority as now provided by law, except that the value of all such property as finally fixed in the year 1934, and each succeeding fourth year thereafter shall be final and binding on all taxing authorities and all owners of such property for four successive tax years, except as to right of appeal. Actual market value of property is hereby determined and fixed to be that price or worth represented by the amount of money, or its equivalent, which would be received therefor at a normal sale in or at a normal market.

"Sec. 3. Each of the three years following any years in which its value is fixed, the assessor shall add to the value of all real property the actual value of any or all improvements which may be placed thereon during the preceding year, and shall deduct from such value the value of all improvements which may have been destroyed or removed during the preceding year. * * *

"Sec. 5. Whenever any real property is found to have been omitted from the tax roll of any year in which real property values were fixed, its value shall be fixed and determined and such value, when so fixed, shall be final and binding on all taxing authorities and all owners of such property until the next year in which general real property values are fixed; and such omitted property so valued shall be listed for the number of years omitted and in the manner as provided by law."

It is to be noted that there has been no change in the law requiring the *listing and assessment* of property to be made annually. N.M.S.A.1929, § 141-201 et seq., Ch. 107, L.1933. It is the *valuation* which is to be fixed every four years. "Assessment proper includes valuation but valuation alone is not assessment but instead only its most important element." Cooley on Taxation, 4th Ed. § 1044.

This is not a case of back assessment of omitted property. Nor is it a case of *reassessment* of property. Counsel for the taxing authorities states in his brief: "In the present case, the assessing officers have not attempted to assess the timber interests of appellant's property for the years 1934, 1935 and 1936, but are endeavoring to assess the same for the current year of 1937."

Apparently the implication is that they do not assert a right to back assess for said years of 1934, 1935 and 1936. This question is not before us. We refer to "omitted property" and the statute relative thereto for *its analogy to omission of component* parts of the property, and omitted "elements of value" not taken into consideration in fixing the valuation, by way of argument merely.

Appellant plants its claim for relief in a court of equity upon the proposition that the property listed by it as grazing land in 1934 and classed as grazing land in Classes C, E, and G, and in that year valued at $1.50, $1 and 50¢ respectively, is a final adjudication of valuation and is res judicata for four successive tax years. It will be useful to here insert a reliable definition of res judicata appearing in Ballentine's Law Dictionary, since we will have frequent occasion to refer to its essentials, one of the more important of which we have given emphasis with italics:

"A thing definitely settled by judicial decision. See State v. Wear, 145 Mo. 162, 192, 46 S.W. 1099.

"The doctrine that an existing final judgment or decree, rendered on the merits, *and without fraud or collusion,* by a court of competent jurisdiction, upon a matter within its jurisdiction, is conclusive of the

rights of the parties or their privies, in all other actions or suits in the same or any other judicial tribunal of concurrent jurisdiction, on the points and matters in issue in the first suit. 15 R.C.L. 950."

This brings us naturally to a consideration of the element of fraud which will deprive a judgment tainted therewith of its conclusive effect. Some who will disagree with our conclusion will readily concede that if the assessor asks the taxpayer if there stands upon his land any merchantable timber of commercial value and the taxpayer should falsely answer in the negative and the assessor relies thereon, this would be a fraud which would vitiate the judgment of the assessor as to the valuation. But our statute penalizes "evasion" as well as misrepresentation. See § 12, Ch. 107, L.1933, again referred to post. It is well settled that where one is under a duty to speak and remains silent as to some essential matter he should disclose, such silence or "evasion" is equivalent to misrepresentation. It is said in Smith on the Law of Fraud, Sec. 8: "Misrepresentation may consist as well in the concealment of what is true as in the assertion of what is false. If a person conceals a fact that is material to a transaction, knowing that the other party acts on the presumption that no such fact exists, it is as much a fraud as if the existence of such fact were expressly denied. * * *"

In Sec. 9, the author cautions that concealment to be fraudulent must be of those facts and circumstances which one party is under some legal and moral obligation to communicate to the other, and which the latter has a right not merely as a matter of conscience but as a matter of law to know. Again in Sec. 10, the author says: "As we have seen under Concealment, it amounts to fraud from which a court of equity will relieve, when there is no peculiar relation of trust and confidence between the parties, and there is non-disclosure of those facts and circumstances which one party is under some legal or equitable obligation to communicate to the other, and which the latter has a right * * * to know. The suppression of material facts may be as obnoxious to the law as untruthful representations, and the same rules apply in each case, * * *"

As is herein shown, we think the taxpayer and the assessor may not deal with each other with hostility and at arm's length. The relationship between the citizen and the taxing officials is one of mutual obligation demanding fair dealing and cooperation.

Valuation and assessment of property is a process required by our law to be participated in by the taxpayer as well as the taxing authorities. Cooley on Taxation, 4th Ed., § 1043, points this out admirably as follows: "The proceedings in the assessment of a tax are not, in any proper sense, hostile to the citizen; they are, on the other hand, proceedings necessary and indispensable to the determination of the exact share which each resident or property owner should take, and may and

should be supposed desirous of taking, in meeting the public necessity for a revenue;—proceedings which the willingness of the taxpayer cannot dispense with, and which only become hostile when the duty to pay, once fixed, fails to be performed by payment. Then, and only then, do the steps taken by the government assume a compulsory form; until then the reasonable presumption is that government and taxpayer will act together in harmony."

As to the effect of concealment or evasion by one under a duty to disclose matters within his knowledge with respect to its bearing on res judicata, Mr. Freeman in his work on Judgments, at § 1233, says: " 'In ordinary situations one may, legally if not morally, keep silent and profit by his adversary's ignorance. That is neither fraud intrinsic, as in the case of perjury, nor fraud extrinsic within the Throckmorton rule. But where there is a solemn duty to speak, independently of coercion, and in a judicial controversy as well, whether asked to speak or not, and there is a failure to speak, resulting in the enrichment of the wrongdoer and the improverishment of the one to whom that duty is owing, there is a fraud of the most serious nature, and in a sense both intrinsic and extrinsic.' The failure to perform the duty to speak or make disclosures which rests upon one because of a trust or confidential relation is obviously a fraud for which equity may afford relief from a judgment thereby obtained, even though the breach of duty occurs during a judicial proceeding and involves false testimony and this is true whether such fraud be regarded as extrinsic or as an exception to the extrinsic fraud rule."

Further as to res judicata see Adams v. Clarke, 80 Miss. 134, 31 So. 216, where it was said [page 219]: "The rule of res adjudicata in reference to assessment for taxes rests upon the same basis as that of other judgments. Wells, Res.Adj. § 483. One who relies upon the conclusive effect of a prior decision must be able to show that the precise point was decided in that proceeding. If there are two issues, on either of which the judgment may have been given, and one would be conclusive, and the other not, there is no res adjudicata. * * * A judgment is conclusive because, and only because, the court by which it is rendered has been advised of the facts, and on those facts has announced its conclusion."

Let us now look at our statutes to see what kind of co-operation is demanded of the taxpayer in his relation to the taxing authorities. A legislative expression which is a re-enactment of earlier statutes in part is found in Ch. 107, L.1933. Sec. 2 declares that *all* property, not otherwise assessed and valued for purposes of taxation, shall be declared, listed, assessed and taxed in the county where it is situated, on the first of January of each year, and shall be included in assessment lists "to be declared *to* the Tax Assessor on or before the First business day of March."

Sec. 4 provides: "Every person, firm, association or corporation shall, *in each*

*year,* make a declaration of all property subject to taxation of which he is the owner or has the control or management, but in no case is he to fix the value of such property, or any portion thereof, except as hereinafter provided; but it shall be the duty of the county assessor to fix the valuation for the purposes of taxation of all property *contained in such declaration* or of which he may otherwise obtain knowledge, at the full actual value thereof. Such declaration shall be made of *all property* as it exists on the first day of January of *each year,* and it shall show *all the property* belonging to, claimed by, or in the possession or under the control or management of, the person making the declaration * * *." (Italics ours.)

Sec. 9 provides that the State Tax Commission shall prescribe the form to be used for the listing and assessment of the *various classes of property* and which forms shall be uniform as to the *various classes of property assessed* and all such forms shall include space for the verification or affirmation thereof.

Sec. 10 makes it the duty of the tax assessor to "make a reasonable and diligent effort to visit all property owners * * * and to view, list and value all such taxable property, the value of which is not otherwise determined by law." and provides: "Such assessor shall secure *from the person or persons* above mentioned a declaration of all taxable property of whatsoever kind and which shall be listed by him upon the form of tax schedules above provided for."

It is further provided therein that the person declaring his property shall affix his oath or affirmation that the declaration "offered the tax assessor" is a true, complete and correct statement of all taxable property owned by or under his control. It is provided further that the failure of the tax assessor to visit the taxpayer shall not release the obligation of such property for tax payment but that the taxpayer if he has not been visited prior to March 1st shall forthwith report a complete list of all property subject to taxation, whereupon such assessor shall value it the same as if such property had been "declared *to him* in person."

This demonstrates that the legislature contemplated that the assessor must rely in part upon the list and declaration required to be made by the property owner, *to* the assessor.

Sec. 11 provides that the assessor shall by public notice inform all taxpayers of the date or dates upon which he will visit each school district "for the purpose of *receiving* declaration of taxable property, and it shall be the duty of each and all taxpayers, property owners or persons in charge of any taxable property to *cooperate with, and assist* in the prompt assessment of property."

Sec. 12 declares that if any person owning or in control of any taxable property shall willfully and knowingly make a false declaration of property, either for himself or for another, he shall be guilty of perjury and punishable therefor as is provided

by law, and further that if any person owning or in control of any taxable property shall willfully seek to or *evade* declaration of or refuse to declare property as is herein provided for, the assessor shall make a true and complete list of said property, value the same, and when extending the taxes against such property shall add to such taxes an amount equal to 25 per cent thereof as a penalty for such "evasion" or refusal to declare the same. If the tax assessor shall ascertain that any property subject to taxation has not been declared, listed and valued as in the Act provided, he shall present a schedule therefor whereon the same shall be listed and valued and shall indicate upon such schedule that the property therein listed and valued was therein "non-listed" during the assessment period and that when extending the taxes against such property he shall add thereto an amount equal to 5 per cent.

Sec. 13 provides that assessment lists theretofore provided shall be made in duplicate, the original to be returned to the tax assessor as a permanent record of his office and from which he shall prepare tax rolls after the final determination of values by the County Board of Equalization, and the duplicate shall be delivered to the taxpayer and shall constitute his notice of the valuation fixed upon the property thereon listed by the assessor and that "Such list or schedule shall contain an *itemization* of the property, or properties thereon shown and the valuations thereof as fixed by the Tax Assessor and

shall be considered final, subject however, to appeal * * *." (Italics ours.)

These provisions demonstrate a legislative intent that the assessor may rely upon the declaration made by the taxpayer until it is proven to be false.

What was adjudicated by the county assessor in 1934 with respect to fixing the valuation for the purpose of taxation of the property "contained in such declaration" was that the land listed by the appellant as grazing land in Classes C, E, and G were of the value of $1.50, $1 and 50¢, respectively.

What appellant sought in his suit in equity was to have the county assessor restrained from carrying out the order of the State Tax Commission that the said county assessor should "reclassify a sufficient number of acres of grazing land assessed to said Vermejo Club so that the same is reclassified as timber land, with a total increase of valuation as a result of such reclassification in the sum of $75,000 for the year 1937."

It is suggested on behalf of the appellee taxing authority that the statute relied upon by appellant has no application to the classification of real property and that the provisions of Ch. 86, L. 1933, giving finality to the valuation fixed on property in 1934 and each succeeding fourth year thereafter, assumes that the classification of real property stated in the declaration of the taxpayer in the year 1934 was a correct classification and that there has been no change therein. It is argued that since

the legislature in 1933 by Chapter 86 specifically provided that where there was a change in the physical condition of real estate after the valuation in 1934 and each succeeding fourth year thereafter by placing improvements on such property, the valuation theretofore fixed should not be final and that where improvements that had existed on such real estate had been destroyed or removed, the valuation theretofore fixed lost its aspect of finality and therefore it is just and reasonable to suppose that the legislature did not intend that where a distinct component part of the property, such as timber, was destroyed by fire or otherwise during the quadrennial period that its classification as timber land should remain the same. It has been suggested that land which has been classified as farming land should during the quadrennial period be reclassified for purposes of taxation if its qualities and value as farm land had been destroyed by flood or by other ravages of nature which have grown familiar to us in what is known as the dust bowl conditions. Also it has been suggested that if grazing lands have become farm lands during the quadrennial period, such lands should be reclassified accordingly. Also it has been urged that as to classifying lands which have been classified by the State Tax Commission and valuations placed thereon appropriate to each class that if due to changing conditions acreage which at one time fell in Class C at $1.50 an acre should thereafter during the quadrennial period properly be classified as Class G at 50¢ an acre that justice requires such reclassification. In other words, it is contended that since Ch. 86, L.1933, deals with valuation and not with classification, we should not by construction read classification into the statute.

From Crozer v. People, 206 Ill. 464, 69 N.E. 489, we learn that Illinois has had for many years a statute providing for quadrennial valuation of real property. The Illinois legislature provided that the assessor should before the 1st day of June in the year 1899 and every fourth year thereafter value the land listed by the taxpayer and similarly to our statute provided that in the annual intervening assessment years the assessor should return a list of all new or added buildings, structures or improvements of any kind, the value of which shall not have been previously added or included in the valuation of the tract or lot on which such improvements had been erected or placed, and in case of the destruction or injury by fire, flood, cyclone, storm or otherwise, or removal of any structures of any kind, "or of the destruction of or any injury to orchard, timber, ornamental trees or groves, the value of which shall have been included in any former valuation of the tract or lot on which the same stood, the assessor shall determine as near as practicable how much the value of such tract or lot has been diminished in consequence of such destruction or injury, and make return thereof." Smith-Hurd Stats. Ill. c. 120, § 291.

And it was further provided that the former valuation should be abated proportionately to such destruction of the component parts of the property which went to make up the valuation.

It is argued that the absence of some such provision in our statute does not necessarily signify a lack of foresight by our legislature but that on the other hand our legislature thought that the same result could be accomplished by change of classification from time to time. We find it unnecessary to express an opinion as to the merits of these interesting suggestions.

In order to invoke Ch. 86, L.1933, appellant must take the position that classification is merely an incident to valuation and that the assessor's acceptance of appellant's list and declaration of 1934 was not only an adjudication that grazing lands in Class C, E, and G were of the value of $1.50, $1 and 50¢ an acre, respectively, but that the assessor also adjudicated that of its 176,984 acres of land listed, 1,600 acres thereof were agricultural land, 40 acres vega land, 200 acres coal land, 35,029 acres grazing land in Class C, 105,085 acres in Class E, and 35,029 acres in Class G, and that Ch. 86, L.1933, is a pronouncement that such classification made in 1934 must so remain until 1938 regardless of the truth of the situation. It has been held that the approval of an assessment list by the tax officials is not conclusive that the taxpayer has listed or that the roll contains all of the property owned by him. Such approval was an adjudication of the property listed as to its value. Adams v. Clarke, supra.

The appellant assumes a very burdensome position. It would be manifestly impossible for the assessor between the time Ch. 86 became effective in the summer of 1933, and January 1, 1934, to personally or through his deputies go upon and estimate and inspect each acre of land or each subdivision of land to see whether it had merchantable timber growing thereon or not, or whether a part of the lands listed were coal lands or agricultural lands or vega lands in order to discharge the new and far-reaching function of placing a valuation on all of the property in his county, which valuation should endure for four succeeding years. The law imposes the duty upon the taxpayer not only to give such a description of his real estate as would be sufficient in a deed to identify it, but also requires him to give information as to the classes of property he owns and requires him to submit a list thereof containing an "itemization" of his property, and these disclosures are required to be under oath. The forms which are prepared by the State Tax Commission pursuant to the provisions of Ch. 107, L.1933, heretofore referred to, and which are furnished to the taxpayer and upon which he must make a list and declaration of all his property, contains a demand for information as to "classification of lands."

One of the sections of this familiar form is as follows:

Classification of Lands

| Class | Acres | at | Value | Improvements |
|-------|-------|----|----|----|
| | | | | Residence |
| | | | | Barns and Other Buildings |
| | | | | Wind Mills, Wells, Pumps and Misc. |
| | | | | Fence:' miles at $ per mile |

It is noted that the different classes of lands are not printed and presumably the property owner will insert the proper. classification. The assessor and the other taxing boards have the right to assume that the taxpayer has truly listed his property and no judgment can be res judicata where the pleadings or what is in lieu of pleadings do not state the facts calling for adjudication. If the taxpayer does not list his timber land or his timber as a component part of the land he describes in his declaration, the taxing authorities have the right to assume that he has no timber thereon of commercial value. There is no reason to suppose that the appellant's officer or agent did not know the duty and purposes of classification when it classified 1,600 acres as agricultural land, 40 acres as vega land, 200 acres as coal land and 175,163 acres as grazing land, failing to classify any of the said acreage as timber lands. As we have heretofore seen, the taxpayer made oath to the list and declaration that "the classification of lands * * * as is herein set forth is true and correct in all particulars."

It is suggested and we are aware that there may be land upon which there exists standing trees· and that this circumstance does not necessarily take the land out of a proper classification as grazing land. We apprehend that there may be instances where there may be timber standing on land and yet such timber may not add to the market value of the land. The timber as such may not be merchantable and it may not have a market value. There may be trees standing on land even in large numbers and still the size, variety and quality may exclude them from the class of merchantable timber. Also the timber may be merchantable in the sense that it is of good quality, and yet not in sufficient quantity as to add to the market value of the land. The usual and customary method of ascertaining the value of merchantable timber involves the essential consideration of location, topography and accessibility. The best of timber would likely add nothing to the market value of the land on which it stands if such timber is inaccessible. And again such timber might be physically accessible but the topography be such that the logging cost would render getting it out unprofitable. There might not be enough of it to warrant the setting up of a saw mill and the construction of a tram road, installation of logging cars, engines, skidders, loaders, etc. If any of these essential considerations necessary to make timber a component part of the land value or an "essential element" for the purpose of valuation in the case at bar were absent we are not advised of it. It

must be remembered that the appellant is plaintiff in a suit in equity who has brought the assessor into court as a party defendant asking injunctive relief against him. The assessor has said in effect that he had been misled by the taxpayer in classifying his land as grazing land, whereas information received later showed that a portion of the lands should have been classified as timber land, and seeks to reclassify it preparatory to making an assessment for a year embraced within the *unexpired portion* of the four-year period for which valuations had been fixed. It would have been open to the plaintiff taxpayer to challenge the facts upon which the assessor asserts his right to make the reclassification. The plaintiff taxpayer did not allege that the assessor had consciously and intentionally classified its timber land as grazing land. It did not assert that it did not know in 1934 that its acreage containing one hundred million board feet of merchantable timber added to the market value of its land because of conditions of location, topography and accessibility. It made no claim that there was any physical or economic condition which rendered the timber unmarketable so as to render the lands properly classifiable as grazing land instead of timber land. It admits that there is in excess of one hundred million board feet of merchantable lumber growing upon its lands which were listed as grazing lands and that said timber has been sold and that the purchaser is now engaged in cutting and removing said timber. It is manifest that if the contention of appellant is sustained, a large portion of

the timber will be removed and the state will lose the revenues it was entitled to receive. There is no claim by the appellant that the timber as a component part of its land so improperly classified is not of a value in excess of $75,000 for the purposes of taxation. Nor could it well do so, because by Sec. 132-177, N.M.S.A.1929, it appears that the State Land Commissioner was prohibited from selling timber on state lands except such as is fit only for firewood, at less than $1.50 per thousand feet board measure, and this minimum figure was raised by Ch. 106, L.1935, to $2 per thousand feet. It would appear then that the valuation fixed by the assessor for the purpose of taxation is less than half of the prevailing price of timber on state lands.

We are not in the case at bar dealing merely with a case of undervaluation. We apprehend that most of the instances of undervaluation do not involve an erroneous classification and also they usually do not involve the failure to consider in the process of valuation some distinct component part or element of value of the property. These distinct component parts or elements of value are few in number. Broadly speaking they are timber, water and minerals. These are so distinct as component parts of real property that they are frequently the subject of separate ownership in different persons. The effect of our holding in State v. Jemez Land Co., 30 N. M. 24, 226 P. 890, is that growing timber is a part of the real estate and that where the land itself and the timber is owned by the same person it should be properly as-

sessed as a part of the realty. Where the land is owned by one person and the timber by another the timber is assessable to the owner of the timber, and in that case we held that the taxpayer is in no wise injured by having the value of his land arrived at by consideration and summing up of the several "elements of value," so long as the total value thus obtained does not exceed the actual value of the real estate.

A case where a taxpayer has omitted to give an itemization of his property so that the assessor may be advised of the distinct component parts of the property or its distinct elements of value presents an easier case than one of mere undervaluation where no such distinct elements of value or component parts of property are apparent. Yet it has been stated that either gross undervaluation or gross overvaluation may be relieved against, if such overvaluation or undervaluation are so excessive as to amount to constructive fraud.

Cooley on Taxation, 4th Ed. Vol. 4, § 1645, says: "Fraud is ground for relief by injunction in tax cases. A tax founded on a fraudulent assessment will be enjoined; and this includes a valuation so excessive as to be constructively fraudulent, whether made by local assessors or by a state board or by a reviewing board. A valuation is necessarily fraudulent where it is so unreasonable that the assessor must have known that it was wrong. If the valuation is purposely made too high through prejudice or a reckless disregard of duty in opposition to what must necessarily be the judgment of all competent persons * * * the case is a plain one for the equitable remedy by injunction."

We recognized this principle in Scholle v. State Tax Commission, 42 N.M. 371, 78 P.2d 1116, April 26, 1938, where we quoted from In re Blatt, supra, to the effect that there is an exception to the pronouncement that there is no method whereby a taxpayer who is aggrieved because of excessive assessments may appeal from the ruling of the State Tax Commission to the courts [page 1117]: "* * * The exception is in a case where a court of equity may review upon facts specifically set forth showing the assessment to be so excessive as to be constructively fraudulent, and then only upon a showing that all other remedies designated by the statute have been exhausted."

It would seem singular that the taxpayer has this protection against a fraud committed by the assessor, and yet when he himself is in a court of equity with the assessor as a defendant, the assessor may not invoke a fraudulent classification of real property resulting in an undervaluation of his property so gross as to amount to constructive fraud. It is a poor rule that does not work both ways.

As we have said in State v. Jemez Land Co., supra, timber and improvements are in the same class with respect to the principle that they are not to be assessed separately, but may be considered as an element of value of the land itself in order to arrive

at the proper valuation of such real estate. To hold as appellant requests us to hold would enable the taxpayer to inform the assessor that there were no improvements on grazing land, or by evasion mislead the assessor and thus obtain a classification thereof as grazing lands *without improvements* and a valuation accordingly, and thereafter, if the assessor at an intervening assessment year during the four-year period says that he does not intend to be longer bound by that valuation because he has found out that the land had improvements on it when the adjudication of value was made, he would be met with a cynical reply: "I know it was my duty to give you correct information but you were a foolish official to rely upon it." Such a holding would penalize the candid taxpayer, properly disposed to co-operate, to his disadvantage and to the advantage of. the untruthful or evasive one.

It is no answer to this illustration to point to Ch. 86, L.1933, as referring to improvements because that refers to improvements added or destroyed after the valuation has been fixed and not to the omission of them as a component part of the land or an element of value thereof existing at the time the adjudication of value of the real estate is made.

The judgment is conclusive because and only because the tribunal by which it is rendered is advised of the facts and on these facts has announced its conclusion. The appellant is in the unenviable position of contending that because it did not list any portion of its lands as timber land it was therefore adjudicated as grazing land; in other words, that it is to be conclusively presumed that things not brought to the attention of the assessor are to be treated as res judicata.

Two things are certain: first, in no event can appellant be required to pay on a greater amount than it justly ought; second, unless appellant was properly denied the assistance of a court of equity it unquestionably will escape the payment of taxes on $75,000 taxable element of value of property which it does not claim it did not own and which escaped the notice of the assessor when the classification and valuation were made in 1934, and which it does not even now claim was properly classified.

The foundation of appellant's contention rests upon the proposition that since the statute requires the taxpayer to return *all* his property with an itemization and classification thereof; when he returns *any* property, even in a false return, the presumption is conclusive that he has returned *all* and in the correct classifications. The contention of appellant would lead to the conclusion that if the taxpayer listed his property as grazing land whereas it was in fact timber land, and the assessor did not discover the fraud immediately, he would forever shield from taxation said land at its true quality and worth.

We are warned in argument that our view will be far-reaching and annoying. We should not be frightened by conse-

quences. But we think the consequences will be wholesome. As was said in Adams v. Clarke, supra: "Every dishonest return of taxes is not only a violation of the law, and besides a wrong to the state, but it is the grossest injustice to those who honestly pay their taxes. If all citizens would take care to pay as they should, the tax rate would be lowered, probably one-half, and property in the hands of corporations and individuals would equally respond to its just burdens."

The taxing statutes should be construed so as to promote fairness rather than to promote fraud. As we said in State v. Southern Pacific Co., 34 N.M. 306, 281 P. 29: "Statutes will be construed in the most beneficial way which their language will permit, to prevent absurdity, hardship, or injustice, to favor public convenience, and to oppose all prejudice to public interests."

In Cooley on Taxation, 4th Ed., § 1665, it is said: "The rule that equity will not aid one who does not come into court with clean hands applies to injunction suits in tax cases. Thus, a taxpayer guilty of bad faith, fraud and tax dodging does not come into equity with clean hands and relief will be denied him."

One of the cases cited by Mr. Cooley is Reid v. Multnomah County, 100 Or. 310, 196 P. 394, where these principles are invoked against a taxpayer seeking equitable relief. The court cited many cases and Mr. Pomeroy's outstanding text on Equity Ju-

risprudence, 4th Ed., §§ 397 and 404, as follows [page 400]:

"Whenever a party who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy. * * *

"Any really unconscientious conduct, connected with a controversy to which he is a party, will repel him from the forum whose very foundation is good conscience."

And in Bell's Trustee v. City of Lexington, 120 Ky. 199, 85 S.W. 1081, a suit by a taxpayer for injunction involving questions similar to those in the case at bar, the court said [page 1082]:

" * * * If appellant had submitted to the assessor the various bonds, mortgages, notes, and other securities which go to make up the aggregate values given in, and the officer, after surveying the whole, had assessed it for less than its real value, the city would have been bound by the valuation, and no reassessment would have been permitted as omitted property. But that is not the case here. The officer simply accepted the return made by the appellant without knowing what property went into the valuation. It was incumbent upon the appellant to make a fair and full disclosure by items of all the property subject to taxa-

tion it held in trust for Clara D. Bell, and it in no wise discharged its duty to the city by imposing upon the officer an aggregate valuation without the items of which it consisted, and without being sworn to as by law required. The officer, too, neglected his duty in accepting the illegal return; but his laches cannot avail the appellant.

"* * * Equity does not favor mere technical defenses to the collection of tax claims. Taxes are the very life blood of the government. The duty of paying a ratable share of this public burden is incumbent on every property holder. Whatever just part of this common burden is shirked by him whose duty it is to bear it, is necessarily cast as an additional burden upon other shoulders: and therefore, while at law one may sometimes be permitted to interpose mere irregularities as a defense to the imposition of taxes, when he asks the aid of the extraordinary power of the chancellor he should show, as a condition precedent to receiving it, that he has a meritorious defense to the tax claim he assails.

"* * * Judge Holt, in speaking of enjoining the collection of taxes, said: 'This being so, it was the duty of the party asking relief to definitely point out the extent to which he was entitled to be relieved. If he seeks equity, he must do equity. He must show his willingness to pay what he in fact owes, or at least in a case like this he must show to the court how much he in fact does not owe. He must, inasmuch as an injunction is peculiarly an equitable remedy, separate the just from the unjust portion of the claim, and ask relief only as to the latter. This the appellee has failed to do, and the judgment is reversed, with directions to dismiss the petition.' The rule, then, is, when one comes into equity asking for relief against taxation, it is incumbent upon him to show clearly that he has paid or is willing to pay all that he justly owes toward the public burden. He must make a full, fair, and complete disclosure of the property he has subject to taxation, so that the court may judge as to whether or not he is unjustly taxed. He must come, not only with clean, but with open, hands."

In view of all these considerations, I think the valuation of the land of appellant in 1934 without the timber is not a final and conclusive adjudication of the value for the period for which such value was fixed, and I agree with the trial court that there was no equity in plaintiff's bill. I therefore dissent.

SADLER, J., concurs.